**David ROCKEFELLER and Margaret McG. Rockefeller, Appellees,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Appellant.**

**ESTATE OF John D. ROCKEFELLER, 3rd, Deceased, John D. Rockefeller, IV, J. Richardson Dilworth and Donal C. O'Brien, Jr., Executors, and Blanchette H. Rockefeller, Appellees,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Appellant.**

Nos. 886, 889, Dockets 81–4197, 81–4199.

United States Court of Appeals, Second Circuit.

Argued March 29, 1982.

Decided April 9, 1982.

Richard Farber, Dept. of Justice, Tax Div., Washington, D. C. (Glenn L. Archer, Asst. Atty. Gen. of the U. S., Michael L. Paup, Anthony Ilardi, Jr., Dept. of Justice, Tax Div., Washington, D. C., of counsel), for appellant.

William E. Jackson, New York City (Howard A. Bolton, Stuart E. Keebler and Joseph M. Persinger, Milbank, Tweed, Hadley & McCloy, New York City, of counsel), for appellees.

Before KAUFMAN, MANSFIELD and CARDAMONE, Circuit Judges.

**IRVING R. KAUFMAN, Circuit Judge:**

In divining the meaning of statutory words, courts have long followed the principle that the legislature is the master,[1] and that statutory interpretation therefore involves a search for evidence of legislative intent.[2] As Justice Frankfurter aptly phrased it, "[t]he Court's task is to construe not English but congressional English."[3] Since words are often empty vessels and legislative history does not always provide specific answers to questions concerning congressional intent, however, courts have recognized that in interpreting statutes they must do more than sift through pages of legislative history for evidence of the technical meaning ascribed to statutory words; judges should interpret statutes in ways that effectuate legislative purpose[4] and avoid unnecessarily harsh and unfair results.[5] Today we must apply these time-honored principles to a novel question of statutory interpretation in determining the meaning of a single word of a statute: "to." Specifically, we must decide whether unreimbursed expenses incurred in rendering services to charitable organizations may qualify for a special unlimited charitable contribution deduction for contributions "to" these charities. We turn now to the facts in this case.

The Commissioner of Internal Revenue appeals from decisions entered by Judge Drennen of the United States Tax Court in consolidated cases, holding that David and Margaret McG. Rockefeller were not liable

1. Lewis Carroll, in *Through the Looking Glass,* delightfully, albeit unwittingly, illustrated the difficulties of statutory interpretation through his fragile, egg-shaped character. "When I use a word," he has this character proudly declare, "it means just what I choose it to mean, neither more nor less." "The question is," Alice replied, "whether you can make words mean so many different things." "The question is," was the response, "which is to be master—that's all." L. Carroll, Through the Looking Glass, ch. 6, quoted in *Liversidge v. Anderson* [1942] A.C. 206, 245 (Lord Atkin).

2. *See* Thayer, *Public Wrong and Private Action,* 27 Harv.L.Rev. 317, 320 (1914). For an insightful discussion of alternative doctrines of statutory construction, see Note, *Intent, Clear*

*Statements, and the Common Law: Statutory Interpretation in the Supreme Court,* 95 Harv. L.Rev. 892 (1982).

3. *Commissioner v. Acker,* 361 U.S. 87, 95, 80 S.Ct. 144, 149, 4 L.Ed.2d 127 (1959) (Frankfurter, J., dissenting).

4. *See J. I. Case Co. v. Borak,* 377 U.S. 426, 433, 84 S.Ct. 1555, 1560, 12 L.Ed.2d 423 (1964), discussed in Note, *supra* note 2, at 893. *See also Federal Deposit Ins. Corp. v. Tremaine,* 133 F.2d 827, 830 (2d Cir. 1943) (L. Hand, J.).

5. *See Bingler v. Johnson,* 394 U.S. 741, 751–52, 89 S.Ct. 1439, 1445, 22 L.Ed.2d 695 (1969).

for certain income tax deficiencies asserted by the Commissioner for the taxable years 1970 and 1971, and that the Estate of John D. Rockefeller, 3rd, John D. Rockefeller, IV, J. Richardson Dilworth and Donal C. O'Brien, Jr., executors, and Blanchette H. Rockefeller were not liable for income tax deficiencies asserted by the Commissioner for the taxable years 1969, 1970, and 1971. In reaching these decisions, Judge Drennen's opinion held that unreimbursed expenses incurred in rendering services to specified charitable organizations qualified for the unlimited charitable contribution deduction allowed under sections 170(b)(1)(C) and 170(g) of the Internal Revenue Code, as in effect during the years 1969, 1970 and 1971.[6] Our reading of the legislative history and the relevant case law leads us to the conclusion that Judge Drennen was correct in deciding that the taxpayers in this case could deduct these unreimbursed expenses pursuant to the unlimited charitable contribution deduction. Accordingly, we affirm the Tax Court's decisions in all respects. Since this is a case of first impression, and other taxpayers have relied upon the unlimited charitable deduction,[7] we set forth our reasoning in some detail.

The facts may be briefly recounted. During 1969 John D. Rockefeller, 3rd, and during 1970 and 1971, John D. Rockefeller, 3rd, David Rockefeller, and other family members shared in the expenses of operating the Rockefeller Family Joint Office, a pooled service center at Rockefeller Plaza in New York City. The Rockefeller Family Joint Office provided family members with legal, accounting, clerical, and technical services, as well as investment services. The various services were undertaken by a staff of approximately 215 persons. Both John D. Rockefeller, 3rd, and David Rockefeller maintained personal offices and staff at the same location in premises near the Joint Office. John D. Rockefeller, 3rd, and David Rockefeller employed both their personal staffs and the staff of the Rockefeller Family Joint Office in conducting their business, philanthropic and personal affairs. Their philanthropic activities, of course, included the provision of services to various charitable organizations. The Rockefellers deducted as charitable contributions the unreimbursed expenses incurred in providing these services. Their unreimbursed expenses included salaries of personal and Joint Office employees, and travel, entertainment and other miscellaneous expenses incurred by John D. Rockefeller, 3rd, David Rockefeller, or by their personal or Joint Office employees in connection with their philanthropic activities.

During 1970, David Rockefeller and during 1971, David and Margaret McG. Rockefeller incurred and paid unreimbursed expenses in the amounts of $75,636 and $79,615 respectively, attributable to services rendered by David Rockefeller, his salaried personal or Joint Office staff, or by Margaret McG. Rockefeller to organizations described as charitable organizations pursuant to sections 170(b)(1)(A) or 170(g)(2)(C) of the Internal Revenue Code, as in effect during those years. During 1969, 1970 and 1971, John D. Rockefeller, 3rd, incurred and paid unreimbursed expenses in the amounts of $152,768, $235,110 and $320,745, respectively, in connection with services rendered by him, his salaried personal or Joint Office staff to charitable organizations.

During the relevant period, 1969 to 1971, the Internal Revenue Code of 1954, as

---

**6.** Tax years 1970 and 1971 are governed by the Code as amended in 1969 rather than the 1964 version in effect during tax year 1969. See Tax Reform Act of 1969, Pub.L.No.91–172, 83 Stat. 487. While several provisions of the 1969 amendments differ from the earlier version, they do not affect our analysis in this case. Accordingly, we shall assume, as did the Tax Court, that the law in effect for 1969 under the 1964 version of the Code applied to all the years involved here.

**7.** It has been estimated that as many as one hundred taxpayers with incomes well in excess of one million dollars utilized the unlimited charitable deduction in 1969. *See* H.R.Rep.No. 413, 91st Cong., 1st Sess. 52 (House Ways and Means Comm.), U.S.Code Cong. & Admin. News, p. 1645.

amended, allowed a deduction for "any charitable contribution (as defined in subsection (c)) payment of which is made within the taxable year." 26 U.S.C. § 170(a) (1963). "Charitable contributions" were defined in section 170(c) as "a contribution or gift *to or for the use of*" (emphasis added) certain classes of recipients. 26 U.S.C. § 170(c) (1963). The Code provided a general limitation on charitable deductions of twenty percent of adjusted gross income, 26 U.S.C. § 170(b)(1)(B), and an additional ten percent deduction for contributions "to" a narrower class of organizations than that defined in subsection (c). 26 U.S.C. § 170(b)(1)(A) (1963).[8] The Rockefellers desired to deduct charitable contributions in excess of the amount provided by these limitations, and therefore sought to take advantage of section 170(b)(1)(C), now since repealed,[9] which provided an unlimited deduction for individuals meeting specified conditions. Under certain conditions— one of which was that in the taxable year and in eight of the preceding ten taxable years, the sum of all contributions plus income tax paid must have been greater than 90 percent (80 percent in 1970 and 74 percent in 1971) of the taxpayer's taxable income—the twenty percent and additional ten percent limitations were not applicable, and a taxpayer could take an unlimited deduction pursuant to section 170(b)(1)(C).[10]

8. Section 170 of the Internal Revenue Code of 1954, 26 U.S.C. § 170 (1963), provided in pertinent part:

(a) Allowance of Deduction.—

(1) General Rule.—There shall be allowed as a deduction any charitable contribution (as defined in subsection (c)) payment of which is made within the taxable year....

\* \* \* \* \* \*

(b) Limitations.—

(1) Individuals.—In the case of an individual the deduction provided in subsection (a) shall be limited as provided in subparagraphs (A), (B), (C), and (D).

(A) Special Rule.—Any charitable contribution to—[certain qualifying organizations] ...

shall be allowed to the extent that the aggregate of such contributions does not exceed 10 percent of the taxpayer's adjusted gross income computed without regard to any net operating loss carryback to the taxable year under section 172.

(B) General Limitation.—The total deductions under subsection (a) for any taxable year shall not exceed 20 percent of the taxpayer's adjusted gross income computed without regard to any net operating loss carryback to the taxable year under section 172....

(C) Unlimited Deduction For Certain Individuals.—The limitation in subparagraph (B) shall not apply in the case of an individual if, in the taxable year and in 8 of the 10 preceding taxable years, the amount of the charitable contributions, plus the amount of income tax (determined without regard to chapter 2, relating to tax on self-employment income) paid during such year in respect of such year or preceding taxable years, exceeds 90 percent of the taxpayer's taxable income for such year, ...

\* \* \* \* \* \*

(c) Charitable Contribution Defined.—For purposes of this section, the term "charitable contribution" means a contribution or gift to or for the use of—
[qualifying organizations] ....

9. Congress began to phase out the unlimited charitable contribution deduction with the Tax Reform Act of 1969, Pub.L.91–172, 83 Stat. 487, 1969–3 C.B. 10, 45. The deduction was ultimately repealed altogether in 1976. The provisions in the amendments do not affect the issue considered by the Tax Court and raised on appeal, and therefore need not be discussed here.

10. Section 170 of the Internal Revenue Code of 1954, 26 U.S.C. § 170 (1963), provided in pertinent part:

(b) Limitations.—

(1) Individuals.—In the case of an individual the deduction provided in subsection (a) shall be limited as provided in subparagraphs (A), (B), (C), and (D) ...

(B) General Limitation.—The total deductions under subsection (a) for any taxable year shall not exceed 20 percent of the taxpayer's adjusted gross income computed without regard to any net operating loss carryback to the taxable year under section 172....

(C) Unlimited Deduction For Certain Individuals.—The limitation in subparagraph (B) shall not apply in the case of an individual if, in the taxable year and in 8 of the 10 preceding taxable years, the amount of the charitable contributions, plus the amount of income tax (determined without regard to chapter 2, relating to tax on self-employment income) paid during such year in respect of such year or preceding taxable years, exceeds 90 percent of the taxpayer's taxable income for such year, ....

Section 170(g) [11] placed two additional conditions on the use of the unlimited deduction: it was limited to contributions "to" qualifying organizations, and the class of eligible recipients was restricted under § 170(g)(2)(A) to those organizations described in § 170(b)(1)(A) and under § 170(g)(2)(B) through (D) to certain other organizations described therein.[12] This was in contrast to the Code's general provisions permitting deductions for contributions "to or for the use of" a broad class of eligible donees. 26 U.S.C. §§ 170(c), 170(b)(1)(B).

The Internal Revenue Service has adopted the position that while unreimbursed expenses for salaries and other items incurred and paid for in rendering services to charitable organizations may be deductible as contributions "for the use of" charitable organizations, such expenses are not contributions "to" charitable organizations, and therefore could not qualify for the unlimited deduction under section 170(b)(1)(C). Accordingly, the Service disallowed the deductions taken by the Rockefellers on their returns for the years in question. David and Margaret McG. Rockefeller filed joint income tax returns for the taxable years 1970 and 1971 in the district of Manhattan, New York. By statutory notice, the Internal Revenue Service determined income tax deficiencies for 1970 and 1971 in the

amounts of $34,266 and $57,295, respectively. John D. Rockefeller, 3rd, and Blanchette H. Rockefeller filed joint income tax returns for the taxable years, 1969, 1970 and 1971 in the district of Manhattan. The Internal Revenue Service, by statutory notice, determined deficiencies in their income tax for 1969, 1970 and 1971 in the sums of $130,081, $125,216 and $234,403, respectively. The sole reason for the adjustments made in these statutory notices was the determination that claimed unreimbursed expenses did not qualify for the unlimited charitable deduction under sections 170(b)(1)(A), 170(b)(1)(C), and 170(g)(2)(A).

The taxpayers petitioned for review in the United States Tax Court. The cases were consolidated for briefing and opinion. The parties stipulated that the unreimbursed expenses were charitable contributions as defined in 170(c), which contained the Code's general definition, that the donee charitable organizations met the requirements of § 170(b)(1)(A), and that the Rockefellers otherwise met the conditions for the unlimited charitable deduction in section 170(b)(1)(C). The sole issue before the Tax Court was whether the unreimbursed expenses qualified for the unlimited deduction as contributions "to" charitable organizations. Rejecting the Commissioner's argument that the unreimbursed ex-

---

**11.** Section 170 of the Internal Revenue Code of 1954, 26 U.S.C. § 170 (1964), provided in pertinent part:

    (g) Application Of Unlimited Charitable Contribution Deduction.

    (1) Allowance of Deduction For Taxable Years Beginning After December 31, 1963.— If the taxable year begins after December 31, 1963—...

    . (B) for purposes of subsection (b)(1)(C), the amount of the charitable contributions for the taxable year (and for all prior taxable years beginning after December 31, 1963) shall be determined without the application of subsection (b)(5) and solely by reference to charitable contributions described in paragraph (2).

    \*   \*   \*   \*   \*   \*

    (2) Qualified Contributions.—The charitable contributions referred to in paragraph (1) are—

    (A) any charitable contribution described in subsection (b)(1)(A);

    (B) any charitable contribution, not described in (b)(1)(A), to an organization described in subsection (c)(2) substantially more than half of the assets of which is devoted directly to, and substantially all of the income of which is expended directly for, the active conduct of the activities constituting the purpose or function for which it is organized and operated;

    (C) any charitable contribution, not described in subsection (b)(1)(A), to an organization described in subsection (b)(1)(A), to an organization described in subsection (c)(2) which meets the requirements of paragraph (3) with respect to such charitable contribution; and

    (D) any charitable contribution payment of which is made on or before the date of the enactment of the Revenue Act of 1964.

**12.** It is conceded that the donee organizations involved here were of the type described in § 170(b)(1)(A), and therefore § 170(g)(2)(A) is the applicable provision.

penses sought to be deducted by the Rockefellers did not qualify for the unlimited deduction on the ground that they were made "for the use of" rather than "to" the recipient organizations, the Tax Court held that the unreimbursed expenses were contributed "to" those organizations and hence qualified for the unlimited deduction. Accordingly, Judge Drennen in his opinion stated that there were no deficiencies in income tax due from David and Margaret McG. Rockefeller for the taxable years 1970 and 1971. He concluded that the estate of John D. Rockefeller, 3rd, and its co-petitioners were not subject to an income tax deficiency for taxable year 1969, but did have income tax deficiencies for 1970 and 1971 in the amounts of $91.00 and $48.00, respectively, which represented sums conceded by petitioners as not qualifying for the deduction.

On appeal from these decisions, the Commissioner again presses the issue raised before the Tax Court: are unreimbursed expenses incurred in rendering services deductible under the unlimited charitable deduction as contributions "to" charitable organizations or do such expenses only constitute contributions "for the use of" charitable organizations? The pieces of legislative history which shed light on this question reveal that Congress has intended the words "for the use of" to mean roughly the equivalent of "in trust for." Accordingly, the Tax Court correctly concluded that while the use of the words contributions "to" rather than "to or for the use of" charitable organizations precluded deduction of contributions to trusts, of which the charities are the ultimate beneficiaries, under the unlimited deduction provisions, Congress did not intend this choice of words to preclude deduction of unreimbursed expenses incurred in rendering services to charities when a taxpayer sought to take advantage of the unlimited deduction. As a result, the Rockefellers properly invoked the unlimited deduction provisions for deducting unreimbursed expenses otherwise deductible under the general charitable contribution provisions. *See* Treas.Reg. 1.170–2(a)(2) (1969). *See also Upham v. Commis-*

*sioner,* 16 B.T.A. 950 (1929); *Wolfe v. McCaughn,* 5 F.Supp. 407 (E.D.Pa.1933).

The first segment of the puzzle concerning Congressional intent is found in the charitable contribution provisions in effect more than sixty years ago. Section 214(a)(11) of the Revenue Act of 1918, ch. 18, 40 Stat. 1068 (1919), permitted tax deductions for contributions or gifts "to" charitable corporations. The Bureau of Internal Revenue soon ruled that deductions could not be taken for contributions to trusts, community chests, and other types of charitable foundations on the ground that these organizations were not organized and operated for charitable purposes, but only served as a conduit for contributions to charities. *See* O.D. 669, 3 C.B. 187 (1920). These organizations were common law trusts; legal title to the contributions remained vested in a trustee which invested the funds prior to disbursement to various charitable organizations.

Responding to pressures from those who viewed the Bureau's interpretation as unduly restrictive, Congress amended the charitable contribution provisions by adopting section 214(a)(11) of the Revenue Act of 1921, ch. 136, 42 Stat. 227 (1921). As amended, section 214(a)(11) permitted deduction of contributions "to or for the use of" charitable organizations, trusts, community chests, and other entities. The legislative history makes clear that Congress intended by this amendment to make contributions or gifts in trust for the benefit of charities eligible for deduction as a charitable contribution. *See* H.R.Rep.No.350, 67th Cong., 1st Sess. 12 (1921) (House Comm. on Ways and Means); Hearings on H.R. 8245 Before the Senate Comm. on Finance, 67th Cong., 1st Sess. 521–34 (1921). Nothing in the legislative history concerning the Revenue Act of 1921 refers to unreimbursed expenses as contributions "for the use of" charities. Moreover, later interpretations of the words "for the use of" in the 1921 modifications reaffirmed that the addition was intended to allow contributions made "in trust for" charitable organizations. *See, e.g., Danz v. Commissioner,* 18 T.C. 454 (1952), *aff'd on other grounds,* 231 F.2d 673 (9th Cir. 1955), *cert. denied,* 352 U.S. 828, 77

S.Ct. 43, 1 L.Ed.2d 50 (1956); *Bowman v. Commissioner*, 16 B.T.A. 1157 (1929); Rev. Rul. 194, 1953–2 C.B. 128; Rev.Rul. 55–275, 1955–1 C.B. 295.

Prior to the 1954 Code, a deduction for charitable contributions was allowed up to a maximum of twenty percent of a taxpayer's net income, unless the unlimited deduction applied. In permitting an additional ten percent deduction for charitable corporations, Congress chose to restrict the contributions eligible for that deduction to those "to," rather than those "for the use of," certain types of charitable organizations in section 170(b)(1)(A) of the 1954 Code. In explaining this restriction, the House Ways and Means Committee Report stated that the limitation on the additional deduction was deliberately adopted to exclude payments to trusts of which charities are the ultimate beneficiaries. H.R.Rep.No.1337, 83rd Cong., 2d Sess. A53 (1954) (House Comm. on Ways and Means). *See also* S.Rep.No.1622, 83rd Cong., 2d Sess. 207 (1954) (Senate Finance Comm.). Nothing in the legislative history concerning the additional ten percent deduction in section 170(b)(1)(A) mentions an intention to exclude unreimbursed expenses from those charitable contributions which qualified for the additional deduction.

In 1964, Congress added the restriction on the unlimited charitable contribution deduction directly in issue in this case. As noted above, section 170(g)(2)(A) restricted the qualifying contributions to only those described in section 170(b)(1)(A), which permits a deduction for contributions "to" certain organizations rather than gifts "to or for the use of" such organizations. Revenue Act of 1964, Pub.L.88–272, 78 Stat. 19 (1964). The legislative history clearly reveals that Congress's intent was to ensure that contributions qualifying for the unlimited deduction would be immediately available to qualifying charities. The Senate Finance Committee noted that contributions to private foundations often do not reach the operating charities for a substantial period of time. *See* S.Rep.No.830, 88th Cong., 2d Sess. 59–60 (1964) (Senate Finance Comm.). These private foundations would hold the contributions in trust for the charities which were the ultimate beneficiaries and invest the gifts rather than make immediate disbursements. The limitation of contributions qualifying for the unlimited deduction to those made "to" charitable organizations was intended by Congress to eliminate deductions for contributions to community chests, foundations, and other entities which would hold the gifts "in trust for" charitable beneficiaries. *See* S.Rep. No.830, 88th Cong., 2d Sess. 59–60 (1964) (Senate Finance Comm.); Senate Finance Comm., Press Release No. 12 (Jan. 14, 1964), *reprinted in* 2 House Comm. on Ways and Means, 89th Cong., 2d Sess., Legislative History of the Revenue Act of 1964, at 2091 (1966). Once again, there is no mention in the legislative history of the Revenue Act of 1964 that unreimbursed expenses may not qualify as contributions "to" charity.[13]

In short, this journey through Congressional corridors reveals no evidence that Congress intended to exclude unreimbursed expenses incurred in rendering services to charities from the contributions qualifying as gifts "to" charities. Neither in the language nor in the legislative history of the relevant provisions did Congress mention unreimbursed expenses incurred in rendering services to charity. Instead, the expressed Congressional intent was to exclude contributions essentially "in trust for" charitable beneficiaries from the ambit of the unlimited charitable deduction, since such contributions often do not reach the charitable beneficiaries for a long period of time.

■ It is undisputed that unreimbursed expenses incurred in rendering serv-

13. The Commissioner argues that Congress's concern with the delayed benefits associated with contributions to private foundations explains only § 170(g)'s restriction of the class of eligible recipients and was fully satisfied by the elimination of private foundations as eligible donees except as expressly provided for in §§ 170(g)(2)(B) and (C). Therefore, he contends, this concern cannot explain § 170(g)'s additional restriction to contributions *to*. Even were we to parse the legislative history so finely, the Commissioner's argument at most establishes that the legislative history of § 170(g) is inconclusive concerning its restriction to contributions *to*. As a result, we would not depart from our ultimate conclusion.

ices to charity are eligible for the general deduction for contributions "to or for the use of" charitable organizations. *See* Treas.Reg. § 1.170–2(a)(2). Moreover, long-standing judicial authority supports the Tax Court's conclusion that such expenses constitute contributions "to" charity as well. In *Wolfe v. McCaughn*, 5 F.Supp. 407 (E.D.Pa.1933), the district court held that unreimbursed expenses of a taxpayer who rendered services to the Y.M.C.A. in Europe during World War I were deductible as charitable contributions under section 214(a)(11) of the Revenue Act of 1918, which allowed deductions for contributions "to" charitable organizations.[14] Accordingly, we agree with the Tax Court that while the restriction of qualifying contributions under the unlimited deduction to those made "to" rather than "to or for the use of" charities precludes deduction of gifts "in trust for" charitable organizations, this restriction does not prevent taxpayers from deducting unreimbursed expenses incurred in rendering services to charitable organizations. *See also Bowman v. Commissioner*, 16 B.T.A. 1157 (1929).[15]

Our conclusion does not rest solely upon the evidence of Congressional intent concerning this specific question which we have gleaned from the relevant legislative history. Courts have consistently reaffirmed that public policy demands a broad and flexible interpretation of statutes governing charitable contributions. *See, e.g., Helvering v. Bliss*, 293 U.S. 144, 150–51, 55 S.Ct. 17, 20, 79 L.Ed. 246 (1934); *Statler Trust v. Commissioner*, 361 F.2d 128 (2d Cir. 1966). As Learned Hand once wrote:

> [I]t is one of the surest indexes of a mature and developed jurisprudence not to make a fortress out of the dictionary;

but to remember that statutes always have some purpose or object to accomplish whose sympathetic and imaginative discovery is the surest guide to their meaning.

*Cabell v. Markham*, 148 F.2d 737, 739 (2d Cir. 1945). Our interpretation of the statute in question promotes the public purpose of encouraging, through tax deductions, significant support of charities by taxpayers of substantial means who advance their own funds for the operation of charitable organizations.

Accordingly, the decisions of the United States Tax Court are affirmed in all respects.

---

**14.** *See also Upham v. Commissioner*, 16 B.T.A. 950 (1929) (unreimbursed expenses incurred by a physician in traveling to meetings of the American Institute of Homeopathy "constituted contributions to" that medical society).

**15.** The cases relied upon by the Commissioner do not encourage us to alter our conclusion. In *Orr v. United States*, 343 F.2d 553, 557 (5th Cir. 1965), the court stated that an unreimbursed insurance payment made by a taxpayer rendering services to a church was not a contribution "to" a charity. Since the issue was whether

the insurance payment was a contribution "to or for the use of" the church, the distinction between contributions "to" and contributions "for the use of" charities was not material to the decision. Moreover, *Archbold v. United States*, 444 F.2d 1120, 1122 (Ct.Cl.1971), provides no support for the Commissioner's position, since the court in *Archbold* noted that the petitioner in that case had not made the claim that unreimbursed legal expenses constituted contributions "to" charity.