# DAVIS ET UX. *v.* UNITED STATES

No. 89–98.  Argued March 26, 1990—Decided May 21, 1990

O'CONNOR, J., delivered the opinion for a unanimous Court.

*Rex E. Lee* argued the cause for petitioners. With him on the brief were *Carter G. Phillips* and *Bart M. Davis*.

*Assistant Attorney General Peterson* argued the cause for the United States. With her on the brief were *Solicitor General Starr, Deputy Solicitor General Wallace, Alan I. Horowitz, David I. Pincus,* and *Francis M. Allegra.**

JUSTICE O'CONNOR delivered the opinion of the Court.

We are called upon in this case to determine whether the funds petitioners transferred to their two sons while they served as full-time, unpaid missionaries for the Church of

---

*Wilford W. Kirton, Jr., Raeburn G. Kennard,* and *Robert P. Lunt* filed a brief for the Church of Jesus Christ of Latter-day Saints as *amicus curiae* urging reversal.

Jesus Christ of Latter-day Saints (Church) are deductible as charitable contributions "to or for the use of" the Church, pursuant to 26 U. S. C. § 170 (1982 ed.).

I

Petitioners, Harold and Enid Davis, and their sons, Benjamin and Cecil, are members of the Church. According to the stipulated facts, the Church operates a worldwide missionary program involving 25,000 persons each year. Most of these missionaries are young men between ages 19 and 22. If the Church determines that a candidate is qualified to become a missionary, the president of the Church sends a letter calling the candidate to missionary service in a specified geographical location. A follow-up letter from the missionary department lists the items of clothing the missionary will need, provides specific information relating to the mission, and sets forth the estimated amount of money needed to support the missionary service. This amount varies according to the location of the mission and reflects an estimate of the amount the missionary will actually need.

The missionary's parents generally provide the necessary funds to support their son or daughter during the period of missionary service. If they are unable to do so, the Church will locate another donor from the local congregation or use money donated to the Church's general missionary funds. The Church believes that having individual donors send the necessary funds directly to the missionary benefits the Church in several important ways. Specifically, it "fosters the Church doctrine of sacrifice and consecration in the lives of its people" as well as reducing the administrative and bookkeeping requirements which would otherwise be imposed upon the Church. App. to Pet. for Cert. 32a.

After accepting the call, the missionary candidate receives priesthood ordinances to serve as an official missionary and minister of the Church. During the missionary service, the mission president (leader of the mission) controls many as-

pects of the missionaries' lives, including the manner of dress and grooming. Missionaries are required to conform to a daily schedule which calls for at least 10 hours per day of actual missionary work in addition to study time, mealtime, and planning time. Mission rules forbid dating, movies, plays, certain sports, and other activities; missionaries are not allowed to take vacations or travel for personal purposes.

Missionaries receive some supervision over their use of funds. The Missionary Handbook instructs missionaries that "[t]he money you receive for your support is sacred and should be spent wisely and only for missionary work. Keep expenses at a minimum. . . . Keep a financial record of all expenditures." App. 13. The mission presidents give similar instructions to the missionaries under their supervision. Although missionaries are not required to obtain advance approval of each expenditure they make from their personal checking account, they do submit weekly reports to their group leader listing the amount of time spent in Church service, the type of missionary work accomplished, and a report of the total expenses for the week and month to date. If a missionary begins to accumulate surplus funds, he is expected to take action to reduce the amount of donations sent to him. The mission president may alter his estimates of the amounts required each month to take into account changing circumstances.

Benjamin and Cecil Davis both applied to become missionaries. In 1979, the Church notified Benjamin by letter that he had been called to missionary service at the New York Mission. A second letter informed him of the estimated amount of money which would be needed to support his service. In 1980, Cecil Davis was notified that he had been called to missionary service at the New Zealand–Cook Island Mission. Cecil also received a second letter informing him about the mission and the amount of money he would need. Petitioners notified their bishop that they would provide the funds requested by the Church to meet their sons' mission

expenses. According to petitioners, both sons made a commitment with them to use the money only in accordance with the Church's instructions.

Petitioners transferred to Benjamin's personal checking account, on which he was the sole authorized signatory, $3,480.89 in 1980 and $4,135 in 1981. During 1981, petitioners transferred $1,518 to Cecil's personal checking account, on which he was the sole authorized signatory. Benjamin and Cecil used this money primarily to pay for rent, food, transportation, and personal needs while on their missions. Benjamin also spent approximately $20 per month to purchase religious tracts and other materials used during his missionary work. Neither Benjamin nor Cecil was required to seek or sought specific approval of each expenditure made from his personal checking account. However, each week Benjamin and Cecil submitted a report of the total expenses for the week and month to date. At the end of their service, Cecil had no money remaining in his account; Benjamin had $150 which he used to purchase a camera. (Petitioners do not claim a deduction for this amount.)

In their joint tax returns filed in 1980 and 1981, petitioners claimed their sons as dependents, but did not claim a charitable contribution deduction under 26 U. S. C. § 170 for the funds sent their sons during their missionary service. On April 16, 1984, petitioners filed an amended income tax return for the years 1980 and 1981, claiming additional charitable contributions of the $3,480.89 and $4,882 paid to their sons during the missionary service. In January 1985, the Internal Revenue Service disallowed the refunds. Petitioners filed a refund suit in the United States District Court for the District of Idaho. In September 1986, petitioners filed a second set of amended returns, limiting their charitable deductions to the amounts indicated by the Church and correcting the number of dependents claimed for each year.

In District Court, petitioners and the United States both moved for summary judgment. 664 F. Supp. 468 (Idaho

1987).    Petitioners argued that the payments they made to support their sons' missionary services were charitable contributions "for the use of" the Church.    Alternatively, they claimed the payments were deductible under Treas. Reg. 1.170A–1(g), 26 CFR § 1.170A–1(g) (1989), which allows the deduction of "unreimbursed expenditures made incident to the rendition of services to an organization contributions to which are deductible."    The District Court ruled in favor of the United States.    It rejected petitioners' claimed deduction for unreimbursed expenditures because petitioners were not themselves performing donated services, and it held that petitioners' payments to their sons were not "for the use of" the Church because the Church lacked sufficient possession and control of the funds.    664 F. Supp., at 471–472.

The Court of Appeals for the Ninth Circuit affirmed.    861 F. 2d 558 (1988).    The Court of Appeals rejected petitioners' claim that the transferred funds were deductible contributions because they conferred a benefit on the Church.    *Id.*, at 561.    Instead, the Court of Appeals held that contributions are deductible only when the recipient charity exercises control over the donated funds.    *Id.*, at 562.    The Court of Appeals reasoned that the beneficiary of a charitable contribution must be indefinite, see *Russell* v. *Allen*, 107 U. S. 163, 167 (1883), and that this requirement cannot be met when the taxpayer makes a contribution directly to the intended beneficiary.    In this case, the Court of Appeals concluded that the Church lacked actual control over the disposition of the funds and thus they were not deductible.    861 F. 2d, at 562.    The Court of Appeals agreed with the District Court that § 1.170A–1(g) did not apply to petitioners, as the regulation permits a deduction for unreimbursed expenses only by the taxpayer who performed the charitable service. *Id.*, at 564.

Because the Court of Appeals' decision conflicted with *White* v. *United States*, 725 F. 2d 1269, 1270–1272 (CA10 1984), and *Brinley* v. *Commissioner*, 782 F. 2d 1326, 1336

(CA5 1986), we granted certiorari, 493 U. S. 953 (1990), and now affirm.

## II

Under § 170 of the Internal Revenue Code of 1954, 68A Stat. 58, as amended, 26 U. S. C. § 170 (1982 ed.), a taxpayer may claim a deduction for a charitable contribution only if the contribution is made "to or for the use of" a qualified organization.   This section provides, in pertinent part:

"(a) Allowance of deduction.

"(1) General rule. —There shall be allowed as a deduction any charitable contribution (as defined in subsection (c)) payment of which is made within the taxable year. A charitable contribution shall be allowable as a deduction only if verified under regulations prescribed by the Secretary.

. . . . .

"(c) Charitable contribution defined. —For purposes of this section, the term 'charitable contribution' means a contribution or gift *to or for the use of*—

. . . . .

"(2) A corporation, trust, or community chest, fund, or foundation—

. . . . .

"(B) organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes . . . ."   (Emphasis added.)

Petitioners contend that the funds they transferred to their sons' accounts are deductible as contributions "for the use of" the Church.   Alternatively, petitioners claim these funds are unreimbursed expenditures under Treasury Regulation § 1.170A–1(g) and therefore are deductible as contributions "to" the Church.*   We first consider whether the payments

---

*The Commissioner has adopted the holding in *Rockefeller* v. *Commissioner*, 676 F. 2d 35, 42 (CA2 1982), that unreimbursed expenses are contributions "to" the Church rather than "for the use of" the Church.   See Rev. Rul. 84–61, 1984–1 Cum. Bull. 40.

at issue here are "for the use of" the Church within the meaning of § 170.

On its face, the phrase "for the use of" could support any number of different meanings. See, *e. g.,* Webster's New International Dictionary (2d ed. 1950) ("use" defined in general usage as "to convert to one's service"; "to employ"; or, in law, "use imports a trust" relationship). Petitioners contend that the phrase "for the use of" must be given its broadest meaning as describing "the entire array of fiduciary relationships in which one person conveys money or property to someone else to hold or employ in some manner for the benefit of a third person." Brief for Petitioners 17. Under this reading, no legally enforceable relationship need exist between the recipient of the donated funds and the qualified donee; in effect, any intermediary may handle the funds in any way that would arguably benefit a charitable organization, regardless of how indirect or tangential the benefit might be. Petitioners also advance a second, somewhat narrower interpretation, specifically that a contribution is "for the use of" a qualified organization within the meaning of § 170 so long as the donee has "a reasonable ability to ensure that the contribution primarily serves the organization's charitable purposes." *Id.,* at 26. In this case, petitioners argue that their payments at least meet this second interpretation. They point to the Church's role in requesting the funds, setting the amount to be donated, and requiring weekly expense sheets from the missionaries. The Service, on the other hand, has historically defined "for the use of" as conveying "a similar meaning as 'in trust for.'" See, *e. g.,* I. T. 1867, II–2 Cum. Bull. 155 (1923).

Although the language of § 170 would support the interpretation of either the Service or petitioners, the events leading to the enactment of the 1921 amendment adding the phrase "for the use of" to § 170 indicate that Congress had a specific meaning of "for the use of" in mind. The original version of § 170, promulgated in the War Revenue Act of 1917, ch. 63, § 1201(2), 40 Stat. 330, did not allow deductions for gifts "for

the use of" a qualified donee. Rather, it allowed individuals to deduct only "[c]ontributions or gifts . . . to corporations or associations organized and operated exclusively for religious, charitable, scientific, or educational purposes. . . ." In interpreting this provision in the Act (and in the subsequent Revenue Act of 1918, ch. 18, §214(a)(11), 40 Stat. 1068), the Bureau of Internal Revenue stated that "[c]ontributions to a trust company (a corporation) in trust to invest and disburse them for a charitable purpose are not allowable deductions under [§170]." O. D. 669, 3 Cum. Bull. 187 (1920). In hearings before the Senate Committee on Finance on the proposed Revenue Act of 1921, representatives of charitable foundations requested an amendment making gifts to trust companies and similar donees deductible even though a trustee, rather than a charitable organization, held legal title to the funds. Hearings on Proposed Revenue Act of 1921 before the Senate Committee on Finance, 67th Cong., 1st Sess., 521 (1921). Testimony before the Committee indicated that numerous communities had established charitable trusts, charitable foundations, or community chests so that individuals could donate money to a trustee who held, invested, and reinvested the principal, and then turned the principal over to a committee that distributed the funds for charitable purposes. *Id.*, at 522–526; see also H. R. Rep. No. 350, 67th Cong., 1st Sess., 12 (1921) (House Comm. on Ways and Means) (amendments "would allow the deduction, under proper restriction, of contributions or gifts to a community chest fund or foundation"); S. Rep. No. 275, 67th Cong., 1st Sess., 18 (1921). Responding to these concerns, Congress overruled the Bureau's interpretation of § 170 (then § 214(a)(11)) by adding the phrase "for the use of . . . any corporation, or community chest, fund, or foundation . . ." to the charitable deduction provision of the Revenue Act of 1921, ch. 136, § 214(a)(11), 42 Stat. 241. In light of these events, it can be inferred that Congress' use of the phrase "for the use of" related to its purpose in amending § 170 of allowing tax-

payers to deduct contributions made to trusts, foundations, and similar donees. An interpretation of "for the use of" as conveying a similar meaning as "in trust for" would be consistent with this goal.

It would have been quite natural for Congress to use the phrase "for the use of" to indicate its intent of allowing deductions for donations in trust, as this phrase would have suggested a trust relationship to the members of the 67th Congress. From the dawn of English common law through the present, the word "use" has been employed to refer to various forms of trust arrangements. See 1 G. Bogert, Trusts and Trustees § 2, p. 9 (1935); Black's Law Dictionary 1382 (5th ed. 1979) (*"Uses* and *trusts* are not so much different things as different aspects of the same subject. A use regards principally the beneficial interest; a trust regards principally the nominal ownership"). In the early part of this century, the word "use" was technically employed to refer to a passive trust, but less formally used as a synonym for the word "trust." See Bogert, *supra*, at 9 ("The words 'use' and 'trust' are employed as synonyms frequently by writers and judges"); 1 R. Baldes, Perry on Trusts and Trustees § 298 (7th ed. 1929) ("A *use,* a *trust,* and a *confidence* is one and the same thing . . ."); 1 Restatement of Trusts §§ 67–72 (Effect of Statute of Uses) (1935). The phrases "to the use of" or "for the use of" were frequently used in describing trust arrangements. See, *e. g., United States* v. *Bowling,* 256 U. S. 484, 486 (1921); *Blanset* v. *Cardin,* 256 U. S. 319, 321 (1921); *Rand* v. *United States,* 249 U. S. 503, 508 (1919). Given that this meaning of the word "use" precisely corresponded with Congress' purpose for amending the statute, it appears likely that in choosing the phrase "for the use of" Congress was referring to donations made in trust or in a similar legal arrangement.

This understanding is confirmed by the Bureau's initial interpretation of the phrase. It is significant that almost immediately following the amendment of § 170, the Commis-

sioner interpreted the phrase "for the use of" as "intended to convey a similar meaning as 'in trust for.'" I. T. 1867, II–2 Cum. Bull. 155 (1923). Rejecting a taxpayer's claim that a gift to a volunteer fire company was deductible as a contribution for the use of the municipality, the Bureau noted that "[i]t does not appear that the municipality in any way has any control over the property of the incorporated volunteer fire company or that it has any voice in the manner in which such property should be used. Upon dissolution of the company, the property would not escheat to the State. A right of appropriation or enjoyment of the property of the fire company does not rest in the municipality." *Ibid.* The Service adhered to its interpretation that "for the use of" conveys "a similar meaning as 'in trust for'" in subsequent rulings permitting taxpayers to deduct the value of gifts irrevocably transferred to a trust for the benefit of qualified organizations. See, *e. g.,* Rev. Rul. 55–275, 1955–1 Cum. Bull. 295; Rev. Rul. 194, 1953–2 Cum. Bull. 128; I. T. 3707, 1945 Cum. Bull. 114. Numerous judicial decisions have relied on this interpretation. See, *e. g., Rockefeller* v. *Commissioner,* 676 F. 2d 35, 40 (CA2 1982); *Orr* v. *United States,* 343 F. 2d 553, 557–558 (CA5 1965); *Thomason* v. *Commissioner,* 2 T. C. 441, 444 (1943); *Danz* v. *Commissioner,* 18 T. C. 454, 464 (1952), aff'd on other grounds, 231 F. 2d 673 (CA9 1955), cert. denied, 352 U. S. 828 (1956). Congress' reenactment of the statute in 1954, using the same language, indicates its apparent satisfaction with the prevailing interpretation of the statute. See *Cammarano* v. *United States,* 358 U. S. 498, 510 (1959); *McCaughn* v. *Hershey Chocolate Co.,* 283 U. S. 488, 492–493 (1931).

The Commissioner's interpretation of "for the use of" thus appears to be entirely faithful to Congress' understanding and intent in using that phrase. Moreover, the Commissioner's interpretation is consistent with the purposes of § 170 as a whole. In enacting § 170, "Congress sought to provide tax benefits to charitable organizations, to encourage the de-

velopment of private institutions that serve a useful public purpose or supplement or take the place of public institutions of the same kind." *Bob Jones University* v. *United States*, 461 U. S. 574, 588 (1983). The Commissioner's interpretation of "for the use of" assures that contributions will in fact foster such development because it requires contributions to be made in trust or in some similar legal arrangement. A defining characteristic of a trust arrangement is that the beneficiary has the legal power to enforce the trustee's duty to comply with the terms of the trust. See, *e. g.*, 3 W. Fratcher, Scott on Trusts § 200 (4th ed. 1988); 1 Restatement of Trusts § 200 (1935). A qualified beneficiary of a bona fide trust for charitable purposes would have both the incentive and legal authority to ensure that donated funds are properly used. If the trust contributes funds to a range of charitable organizations so that no single beneficiary could enforce its terms, the trustee's duty can be enforced by the Attorney General under the laws of most States. See 4A W. Fratcher, Scott on Trusts § 391 (4th ed. 1989); G. Bogert, Trusts and Trustees § 411 (2d ed. 1977). Although the Service's interpretation does not require that the qualified organization take actual possession of the contribution, it nevertheless reflects that the beneficiary must have significant legal rights with respect to the disposition of donated funds.

Petitioners argue that any interpretation of "for the use of" that requires a qualified donee to have the same degree of control over contributed funds as a beneficiary would have over a trust *res* would make "for the use of" redundant, meaning no more than "to." We disagree. When Congress amended § 170, it was fully aware of the Bureau's ruling that the original statutory deduction for contributions "to" a qualified organization could not be claimed for contributions made in trust for the organization. See O. D. 669, 3 Cum. Bull. 187 (1920). Accordingly, Congress amended the statute specifically to overcome this interpretation. Moreover, a contribution made in trust for a charity does not give the charity

immediate possession and control, as does a donation directly to a charity. Unlike a contribution that must go "to" a qualified organization, a contribution "for the use of" a donee may go to a trustee with the discretion to select among a number of qualified donees to whom the funds may be disbursed. See, e. g., *Bowman* v. *Commissioner*, 16 B. T. A. 1157, 1163–1164 (1929). Furthermore, a taxpayer may generally claim an immediate deduction for a gift to a trustee, even though receipt of the gift by the charity is delayed. Recognizing this characteristic of gifts in trust, Congress further amended § 170 in 1964 in order to encourage donations "to" a charity, because donations "in trust for" a charity "often do not find their way into operating philanthropic endeavors for extended periods of time." S. Rep. No. 830, 88th Cong., 2d Sess., 59–60 (1964).

Although the Service's interpretive rulings do not have the force and effect of regulations, see *Bartels* v. *Birmingham*, 332 U. S. 126, 132 (1947), we give an agency's interpretations and practices considerable weight where they involve the contemporaneous construction of a statute and where they have been in long use. See, e. g., *Norwegian Nitrogen Products Co.* v. *United States*, 288 U. S. 294, 315 (1933). Under the circumstances presented here, we think there is good reason to accept the Service's interpretation of "for the use of." The denial of deductions for donations in trust that prompted Congress to amend § 170, the accepted meaning of "use" as synonymous with the term "trust," and the Service's contemporaneous and longstanding construction of § 170 constitute strong evidence in favor of this interpretation.

Although the language of the statute may also bear petitioners' interpretation, they have failed to establish that their interpretation is compelled by the statutory language. To the contrary, there is no evidence that Congress intended the phrase "for the use of" to be interpreted as referring to fiduciary relationships in general or as referring to a type of relationship that gives a qualified organization a reasonable abil-

ity to supervise the use of contributed funds. Rather, as noted above, there are strong indications that Congress intended a more specific meaning. Moreover, petitioners' interpretations would tend to undermine the purposes of § 170 by allowing taxpayers to claim deductions for funds transferred to children or other relatives for their own personal use. Because a recipient of donated funds need not have any legal relationship with a qualified organization, the Service would face virtually insurmountable administrative difficulties in verifying that any particular expenditure benefited a qualified donee. Cf. § 170(a)(1). Although there is no suggestion whatsoever in this case that the transferred funds were used for an improper purpose, it is clear that petitioners' interpretation would create an opportunity for tax evasion that others might be eager to exploit. See, *e. g.*, Scialabba, Kurtzman, & Steinhart, Mail-Order Ministries Under the Section 170 Charitable Contribution Deduction: The First Amendment Restrictions, the Minister's Burden of Proof, and the Effect of TRA '86, 11 Campbell L. Rev. 1 (1988); Note, "I Know It When I See It": Mail-Order Ministry Tax Fraud and the Problem of a Constitutionally Acceptable Definition of Religion, 25 Am. Crim. L. Rev. 113 (1987). We need not determine whether petitioners' interpretation of "for the use of" would have been a permissible one had the Service decided to adopt it, though we note that the Service may retain some flexibility to adopt other interpretations in the future. It is sufficient to decide this case that the Service's longstanding interpretation is both consistent with the statutory language and fully implements Congress' apparent purpose in adopting it. Accordingly, we conclude that a gift or contribution is "for the use of" a qualified organization when it is held in a legally enforceable trust for the qualified organization or in a similar legal arrangement.

Viewing the record here in the light most favorable to petitioners, as we must after a grant of summary judgment for the United States, we discern no evidence that petitioners

transferred funds to their sons "in trust for" the Church. It is undisputed that petitioners transferred the money to their sons' personal bank accounts on which the sons were the sole authorized signatories. Nothing in the record indicates that petitioners took any steps normally associated with creating a trust or similar legal arrangement. Although the sons may have promised to use the money "in accordance with Church guidelines," see App. to Pet. for Cert. 36a, they did not have any legal obligation to do so; there is no evidence that the guidelines have any legally binding effect. Nor does the record support the assertion, see Tr. of Oral Arg. 19–20, that the Church might have a legal entitlement to the money or a civil cause of action against missionaries who used their parents' money for purposes not approved by the Church. We conclude that, because petitioners did not donate the funds in trust for the Church, or in a similarly enforceable legal arrangement for the benefit of the Church, the funds were not donated "for the use of" the Church for purposes of § 170.

### III

Petitioners contend, in the alternative, that their transfer of funds into their sons' account was a contribution "to" the Church under Treas. Reg. § 1.170A–1(g), 26 CFR § 1.170A–1(g) (1989), which provides:

> "*Contributions of services.* No deduction is allowable under section 170 for a contribution of services. However, unreimbursed expenditures made incident to the rendition of services to an organization contributions to which are deductible may constitute a deductible contribution. For example, the cost of a uniform without general utility which is required to be worn in performing donated services is deductible. Similarly, out-of-pocket transportation expenses necessarily incurred in performing donated services are deductible. Reasonable expenditures for meals and lodging necessarily incurred while away from home in the course of perform-

ing donated services also are deductible. For the purposes of this paragraph, the phrase 'while away from home' has the same meaning as that phrase is used for purposes of section 162 and the regulations thereunder."

Petitioners assert that this regulation allows them to claim deductions for their sons' unreimbursed expenditures incident to their sons' contribution of services. We disagree. The plain language of § 1.170A–1(g) indicates that taxpayers may claim deductions only for expenditures made in connection with their own contributions of service to charities. Unless there is a specific statutory provision to the contrary, a taxpayer ordinarily reports his own income and takes his own deductions. See, e. g., Commissioner v. Culbertson, 337 U. S. 733, 739–740 (1949) ("[T]he first principle of income taxation [is] that income must be taxed to him who earns it"); New Colonial Ice Co. v. Helvering, 292 U. S. 435, 440–441 (1934) ("[T]axpayer who sustain[s] the loss is the one to whom the deduction shall be allowed"). Section 1.170A–1(g) is thus most naturally read as referring to the individual taxpayer, who may deduct only those "unreimbursed expenditures" incurred in connection with the taxpayer's own "rendition of services to [a qualified] organization." This interpretation of the regulation is consistent with the Revenue Ruling that was the precursor to § 1.170A–1(g). See Rev. Rul. 55–4, 1955–1 Cum. Bull. 291 ("A taxpayer who gives his services gratuitously to an association, contributions to which are deductible under [§ 170] and who incurs unreimbursed traveling expenses . . . may deduct the amount of such unreimbursed expenses in computing his net income . . ."). It would strain the language of the regulation to read it, as petitioners suggest, as allowing a deduction for expenses made incident to a third party's rendition of services rather than to the taxpayer's own contribution of services. Similarly, the taxpayer is clearly intended to be the subject of the other provisions in the regulation. For example, it is most natural to read the regulation as referring to a taxpayer who incurs

expenditures for meals and lodging while away from his home, not while a third party is away from *his* home.

Petitioners' interpretation not only strains the language of the statute, but would also allow manipulation of § 1.170A–1(g) for tax evasion purposes. See Note, Does Charity Begin at Home? The Tax Status of a Payment to an Individual as a Charitable Deduction, 83 Mich. L. Rev. 1428, 1434–1435 (1985); *Brinley* v. *Commissioner*, 782 F. 2d, at 1338 (Hill, J. dissenting). For example, parents might be tempted to transfer funds to their children in amounts greater than needed to reimburse reasonable expenses incurred in donating services to a charity. Parents and children might attempt to claim a deduction for the same expenditure. Controlling such abuses would place a heavy administrative burden on the Service, which would not only have to monitor the taxpayer's records, but also correlate them with the records of the third party. To the extent petitioners' interpretation lessens the likelihood that claimed charitable contributions actually served a charitable purpose, it is inconsistent with § 170.

Petitioners cite judicial decisions that allowed taxpayers to claim deductions for the expenses of third parties who assisted the taxpayers in rendering services to qualified organizations. See, *e. g.*, *Rockefeller* v. *Commissioner*, 676 F. 2d 35 (CA2 1982); *McCollum* v. *Commissioner*, 37 TCM 1817 (1978); *Smith* v. *Commissioner*, 60 T. C. 988 (1973). These cases are inapposite, as petitioners do not claim that they were independently rendering services to the Church, assisted by their sons.

We conclude that § 1.170A–1(g) does not allow taxpayers to claim a deduction for expenses not incurred in connection with the taxpayers' own rendition of services to a qualified organization. Therefore, petitioners are not entitled to a deduction under § 1.170A–1(g).

Petitioners also assert that because their sons are agents of the Church authorized to receive payments to support their

own missionary efforts, payments made to their sons are payments to the Church. Because this argument was neither raised before nor decided by the Court of Appeals, we decline to address it here. See, *e. g.*, *Delta Air Lines, Inc.* v. *August*, 450 U. S. 346, 362 (1981); *United States* v. *Mendenhall*, 446 U. S. 544, 551–552, n. 5 (1980).

Accordingly, we hold that petitioners' transfer of funds into their sons' accounts was not a contribution "to or for the use of" the Church for purposes of § 170. The judgment of the Court of Appeals is

*Affirmed.*