JOHNSON CITY MEDICAL CENTER,
Plaintiff–Appellant,

v.

UNITED STATES of America,
Defendant–Appellee.

No. 92–5499.

United States Court of Appeals,
Sixth Circuit.

Argued March 1, 1993.

Decided July 23, 1993.

Rehearing and Suggestion for Rehearing
En Banc Denied Sept. 9, 1993.*

D. Michael Swiney, Andrew R. Tillman (briefed), Paine, Swiney & Tarwater, Knoxville, TN, Mark A. Borreliz (argued and briefed), Heller, Borreliz & Katz, Jamie W. Katz (briefed), Heller, Borreliz & Katz, Boston, MA, for plaintiff-appellant.

Joseph F. Minni, Trial Atty., U.S. Dept. of Justice, Tax Div., Gary R. Allen, Acting Chief (briefed), Jonathan S. Cohen, Sara K. Knutson (argued), U.S. Dept. of Justice, Appellate Section Tax Div., Washington, DC, for defendant-appellee.

Before: KEITH and BATCHELDER, Circuit Judges; and CHURCHILL, Senior District Judge.**

* Judge Batchelder would grant rehearing for the reasons stated in her dissent.

** The Honorable James P. Churchill, Senior United States District Judge for the Eastern District of Michigan, sitting by designation.

KEITH, Circuit Judge.

Plaintiff–Appellant, Johnson City Medical Center ("the hospital"), appeals from the district court's judgment on behalf of the United States, dismissing all of the plaintiff's claims for recovery of FICA taxes. For the reasons stated below, we **AFFIRM.**

## I.

This is a case of first impression regarding the interpretation of an exception for certain services performed "as a student nurse" from coverage under the Federal Insurance Contribution Act (FICA), I.R.C. §§ 3101–3128. On June 21, 1989, Johnson City Medical Center Hospital ("the hospital"), filed a complaint with the district court seeking to recover FICA taxes collected by the IRS for 18 student nurses employed from 1983 through 1986. They argued that the taxes were erroneously assessed, because the services of the student nurses were exempted under the student nurse exception in the Internal Revenue Code.

The hospital is a community non-profit health care institution in Johnson City, Tennessee. During 1985 and 1986, the hospital employed the 18 student nurses in this case, who were all attending a nurse training program at East Tennessee State University (ETSU). These employees worked in different capacities in the hospital, including nurse technician, nurse extern, administrative control center (ACC) secretary, nursing assistant and licensed practical nurse.

Nurse technicians were required to have completed the first semester of clinical instruction. The general duties of nurse technicians included direct patient care, giving baths, taking vital signs, and performing minor treatments. Nurse externs were all senior nursing students, whose general duties included giving baths, taking vital signs, walking and turning patients, and inserting feeding tubes, under supervision. The ACC secretary position required no previous experience and was open to high school graduates. The duties included answering patient call lights, checking x-ray orders, assisting in transcribing physician orders and securing medications from the pharmacy. Nurse assistants were not required to be enrolled in nursing school, and provided direct patient care. The licensed practical nurses (LPN's) were required to be graduates of nursing school and licensed to practice in Tennessee. The LPN's provided direct patient care, were responsible for the nursing care of the patients assigned to them, and supervised nurse assistants and nurse technicians.

The student nurses were all paid less than registered nurses (RN's), and worked no more than 40 hours per two week pay period. The student nurses did not receive credit toward their nursing degree with ETSU for their employment with the hospital. Although ETSU conducted a clinical program at the hospital, it was separate from the hospital's hiring of student nurses as employees.

From 1983 to 1986, the hospital made FICA payments on behalf of the nursing student employees in this case. The amounts at issue consist of wages earned during the time that the student nurses were employed at the hospital and enrolled as nursing students. By the time of trial, the total refund sought by the hospital was $3,496 for 1985 and 1986.

The district court held a one-day bench trial on April 25, 1991. On February 7, 1992 the court entered a final judgment on behalf of the United States dismissing all of the hospital's claims. 783 F.Supp. 1048. The district court based its decision on Revenue Ruling 85–74. The district court determined that the agency interpretation contained in Revenue Ruling 85–74 was not repugnant to the statute or its legislative history. Furthermore, the court found that the services of the student nurses were not exempted because they were not incidental to obtaining a degree. The student nurses did not receive academic credit for their work, the services were sporadic and unconnected to an educational plan, and their earnings were not nominal. On April 3, 1992, the hospital filed a timely notice of appeal.

## II.

As both parties agree, the primary issue in this case is the interpretation of the following

Internal Revenue Code provision regarding the exemption of student nurses as employees:

> any service, of whatever nature, performed . . . by an employee for the person employing him . . . except that such term shall not include—
>
> (13) service performed as a student nurse in the employ of a hospital or a nurses' training school by an individual who is enrolled and is regularly attending classes in a nurses' training school chartered or approved pursuant to State law.

I.R.C. § 3121(b)(13). In 1985, the IRS issued a Revenue Ruling explaining the student nurse exception and the applicable legislative history as follows:

> In enacting the exception under section 3121–(b)(13) of the Code, Congress stated that "[t]he intent of the amendment is to exclude those persons and those organizations in which the employment is part-time or intermittent; and the total amount of earnings is only nominal, and the payment of the tax is inconsequential and a nuisance. The benefit rights built up are also inconsequential. Many of those affected, such as students . . . will have other employment which will enable them to develop insurance benefits." H.R.Rep. No. 728, 76th Cong., 1st Sess. 18 (1939), 1939–2 C.B. 538, 543.
>
> The language of the statute, including use of the phrase "student nurse," and the legislative history indicate Congress' intent to except services as a student nurse from the definition of employment only if the following three requirements are met:
>
> (1) The employment is substantially less than full time,
>
> (2) The total amount of earnings is nominal, and
>
> (3) The only services performed by the student nurse for the employer are incidental parts of the student nurse's training toward a degree which will qualify him or her to practice as a nurse or in a specialized area of nursing.

Revenue Ruling 85–74, 1985–1 C.B. 331, 332.

The hospital interprets the language of § 3121(b)(13) to exclude from FICA coverage employees who are also nursing students. The government interprets the language as excluding only nursing students who are working in the hospital as part of their training for a degree. In its decision, the district court concluded that, pursuant to Revenue Ruling 85–74, the services of the student nurses were not exempted from employment under § 3121(b)(13). Because this case is one of statutory construction, this Court's scope of review is *de novo*. *United States v. Buckley*, 934 F.2d 84, 87–88 (6th Cir.1991).

When an agency is charged with the interpretation of a statute this Court must follow the dictates of *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). The *Chevron* court set forth the following standard:

> When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather if the statute is silent or ambiguous with respect to the specific issues, *the question for the court is whether the agency's answer is based on a permissible construction of the statute.*

*Id.* at 842–43, 104 S.Ct. at 2781–82 (emphasis added).

The reviewing " 'court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding.' " *CenTra, Inc. v. United States*, 953 F.2d 1051, 1055–56 (quoting *Chevron U.S.A.*, 467 U.S. at 843 n. 11, 104 S.Ct. at 2782 n. 11) (1992).

Instead, "a Revenue Ruling is entitled to some deference unless 'it conflicts with the statute it supposedly interprets or with that statute's legislative history or if it is otherwise unreasonable.'" *CenTra, Inc.*, 953 F.2d at 1056; *See also Threlkeld v. Commissioner* 848 F.2d 81, 84 (6th Cir.1988) (citing *Brook, Inc. v. Commissioner*, 799 F.2d 833, 836 n. 4 (2d Cir.1986)).

In our analysis, this Court must first determine whether Congress' intent as to § 3121(b)(13) is clear and unambiguous. A brief historical overview of the origination of the exception is necessary in order to make that determination.

FICA involves the contributory aspect of a system of old age insurance which was passed by Congress under the Social Security Act of 1935. An employee's eligibility for FICA benefits depends upon the total wages received, the periods during which wages were paid, and a minimum work requirement. *Helvering v. Davis*, 301 U.S. 619, 635, 57 S.Ct. 904, 906, 81 L.Ed. 1307 (1937). Contribution is made by taxing the employees and employers. The income tax on employees is collected by the employers through deductions in pay.

In 1939, Congress passed the Social Security Act Amendments of 1939, which included exclusions to FICA. The student nurse exception is an exclusion contained in one of the 1939 amendments. Congress' rationale for these type of exclusions was as follows:

> In order to eliminate the nuisance of inconsequential tax payments the bill excludes certain services performed for fraternal benefit societies and other nonprofit institutions exempt from income tax, and certain other groups. While the earnings of a substantial number of persons are excluded by the recommendation, the total amount of earnings involved is undoubtedly very small ... The intent of the amendment is to exclude those persons and those organizations in which the employment is part-time or intermittent and the total amount of earnings is only nominal, and the payment of the tax is inconsequential and a nuisance.

H.R.Rep. No. 728, 76th Cong., 1st Sess. (1939), *reprinted in* 1939–2 C.B. 538.

In 1939, when this exception was passed, the majority of nursing schools were owned and operated by hospitals. *The Advance of American Nursing* 160–61, 484, 646–47 (2d ed. 1986) (*American Nursing*). Students lived at the hospital, and were often provided with room, board and a stipend. *Id.* at 300, 391, 581. In order to pay for their education, students performed direct patient care services. *Id.* at 656. Nursing education has subsequently changed significantly. The majority of training is now received in an academic setting, as evidenced by the closing of hundreds of hospital-based schools. *Id.* at 704–05.[1]

The exception appears to be available to any student nurse who is enrolled and attending classes in an approved nurses' training school, regardless of whether the student received academic credit for his employment. This interpretation, however, gives rise to an inherent ambiguity within the statute. According to the historical context in which this provision was passed, the exception was intended for students whose employment would be credited toward their degree, as was required in 1939. In light of this ambiguity, this Court must reach the second tier of analysis under *Chevron*, and determine whether the agency's position is based upon a permissible construction of the statute.

■ A revenue ruling, as opposed to a legislative regulation, is an interpretive regulation which is "not entitled to the deference accorded a statute." *Threlkeld v. Commissioner*, 848 F.2d 81, 84 (6th Cir.1988). Nevertheless, "a revenue ruling is entitled to some deference unless 'it conflicts with the statute it supposedly interprets or with that statute's legislative history or if it is otherwise unreasonable.'" *CenTra*, 953 F.2d at 1056 (quoting *Threlkeld*, 848 F.2d at 84).

---

1. In 1982, there were a total of 288 hospital school nursing programs, and 1,144 collegiate nursing programs. American Nursing at 704.

Revenue Ruling 85–74 sets forth three conditions to be met for the Student Nurse Exemption to apply:

1. The employment is substantially less than full time;

2. The total amount of earnings is nominal; and

3. The only services performed by the student nurse are incidental parts of the student nurse's training toward a degree which will qualify him or her to practice as a nurse in a specialized area of nursing.

Rev. Rul. 85–74, 1985–1 C.B. 331.

■ On appeal, the hospital challenges the third condition asserting that it is disconnected from any authority, and therefore outside of the realm of permissible agency interpretation. The hospital argues that the third condition contradicts Congress' intent to preserve through the enactment of § 3121(b)(13) a recognized FICA exemption for the benefit of student nurses. An incorporation of the requirements of the Revenue Ruling would render the Student Nurse Exemption meaningless, because, student nurses no longer receive academic credit for the paid services rendered. Student nurses only receive academic credit for clinical rotations in hospitals, for which they do not receive pay.

The government does not contest the fact that the third condition of the revenue ruling nullifies § 3121(b)(13). However, the government argues that this change is not due to the revenue ruling, but instead to changes in nursing education, where the responsibility for educating nurses has shifted from hospitals to educational institutions. As the government argues in its brief, "hospitals are no longer the primary trainers of nursing students employed in degree programs; they are the primary employers of nursing students trained by degree programs." (Appellee's Brief at 36).

The hospital has not levied a plausible argument that the revenue ruling conflicts with the legislative history of the student nurse exception, or is unreasonable in any other way. The revenue ruling simply reflects the legislative history of the statute, that the exception be granted to those students nurses who are receiving academic credit for their work. Therefore, this Court accords deference to Revenue Ruling 85–74 under the standard set forth in *Chevron*.

### III.

■ The hospital's final argument is that even if Revenue Ruling 85–74 is valid, the district court erred in applying it to the facts of this case. Specifically, the hospital asserts that the district court erred in concluding that the student nurse wages were not material and that their services were not an incidental part of their training.

In its opinion, the district court reasoned that the wages were not nominal when it noted that the earnings of the student nurses:

... ranged from $4,852.24 for a seven-month period down to $46.67 for a student nurse who worked one 8½ hour shift. Student nurses were compensated the same as other employees who worked the same number of hours.

*Johnson City*, 783 F.Supp. at 1052. The evidence in this case showed that the student nurses earned between $4.48 and $10.13 per hour during the pay periods in question.

The hospital argues that the district court incorrectly analyzed the wages of the student nurses. Specifically, the hospital contends that the statute which establishes the categories of FICA-exempt employment specifically directs that eligibility for exemptions be determined on a "pay period" basis. 26 U.S.C. § 3121(c). That section provides, in relevant part:

(c) Included and excluded services—For purposes of this chapter, if the services performed during one-half or more of any pay period by an employee for the person employing him constitute employment, all the services of such employee for such period shall be deemed to be employment; but if the services performed during more than one-half of any such pay period by an employee for the person employing him do not constitute employment, then none of

the services of such employee for such period shall be deemed to be employment. I.R.C. § 3121(c).

The hospital claims that the district court ignored the instructions of the above statute, and aggregated multiple pay periods in order to conclude that one of the student nurses earned over $4,852.24 in one seven-month pay period.

The government argues that § 3121(c) does not apply to the facts of this case because the statute is only relevant in situations where an employee does two types of work for the same employer. *Inter–City Truck Lines, Ltd. v. United States,* 408 F.2d 686, 687, 187 Ct.Cl. 290 (1969) (legislative history of section 3121(c) indicates that the section only applies to situations where an employee performs two different kinds of work for one employer). In this case, the nursing students provided the same essential services, regardless of their pay period. Therefore, the district court did not err in its calculation of wages, because nominal pay criteria need not be determined on a pay period basis.

■ The hospital also argues that the services performed by the student nurses were incidental parts of their training toward a nursing degree. The hospital states that "a clear and practical nexus existed between the Student Nurses' work and their formal training." (Appellant's Brief at 40). According to the hospital, the student nurses performed services germane to nursing care, enhancing their education. There is no dispute, however, that the services were not connected to any formal course of training. Although their employment may have enhanced their nursing abilities, the services they provided were not part of any educational plan. The hospital, therefore, has not shown that this employment was incidental to their education.

### IV.

For the above stated reasons, we **AFFIRM** the decision of the Honorable Thomas G. Hull, United States District Judge for the Eastern District of Tennessee, for the reasons set forth in his February 7, 1992 order.

BATCHELDER, Circuit Judge, dissenting.

I accept the majority's recitation of the stipulated facts and its finding that the statute does not speak directly to the precise question in issue, but my analysis and conclusion differ significantly from the majority's. I therefore write separately to set out what I believe to be the correct analytical approach and the result that follows from it.

*A. A Revenue Ruling is Not Entitled to* Chevron *Deference*

As the majority notes, I.R.C. § 3121(b)(13) was enacted in 1939 and exempts from FICA taxes income from employment "as a student nurse in the employ of a hospital or a nurses' training school by an individual who is enrolled and is regularly attending classes in a nurses' training school chartered or approved pursuant to State law." In 1960, the IRS promulgated a regulation on this issue using virtually the same language as the statute: "Services performed as a student nurse in the employ of a hospital or a nurses' training school are excepted from [FICA withholding], if the student nurse is enrolled and is regularly attending classes in a nurses' training school and such nurses' training school is chartered or approved pursuant to State law." 26 C.F.R. § 31.3121(b)(13)–1 (1992). Then, in 1985, the IRS issued the revenue ruling at issue in this case, narrowly defining the student nurse exemption.

In every case involving the interpretation of a statute, we must first consider whether the statute itself plainly addresses the issue at bar. Although § 3121(b)(13) expresses a general notion about the student nurse exemption, I agree that it does not directly answer the precise question before us. Congress, by the language it used, expressly limited the student nurses who would qualify for this exemption to those student nurses who worked at a hospital, were enrolled in a state-accredited nursing school, and regularly attended classes; however, Congress did not define "employment as a student nurse." We therefore must resolve the question of what qualifies as employment as a student nurse.

The majority rather perfunctorily finds that *Chevron*[1] deference applies in this case, apparently believing that Revenue Ruling 85–74 is an "agency's answer" within the meaning of *Chevron.* A look at *Chevron* and other Supreme Court decisions shows this not to be the case. *Chevron* concerned a challenge to an EPA regulation, which implemented, pursuant to explicit grant of authority by Congress, certain provisions of the Clean Air Act. The EPA's regulations permitted the states to adopt a plantwide definition of the term "stationary source." The Court held that the EPA's plantwide definition was a permissible construction of the statutory term "stationary source" and that courts should generally defer to an agency's regulations that interpret or implement its congressional mandate. But *Chevron* requires that we show substantial deference to an agency's *regulations,* and it is to the regulation that we must look first. In this case, then, we must consider[2] the IRS's regulation on the issue, i.e., 26 C.F.R. § 31.-3121(b)(13)–1.

After considering what the regulation says, it is obvious why the majority fails to mention that there is a regulation on this matter: the regulation says nothing more than the statute says. However, this does not mean the regulation is irrelevant. The IRS's adoption, some twenty years after the enactment of the statute, of a regulation which mirrors the statutory language, indicates that the IRS believed that the language of the statute was plainly sufficient. Come 1985, however, the IRS apparently believed that the regulation it had promulgated was insufficient, and therefore issued a revenue ruling on the matter.

Since the regulation is not helpful, we face the question of whether *Chevron* deference applies with equal force to a revenue ruling. The majority offers a few hints in this regard (e.g., "a Revenue Ruling is entitled to some deference" and a "revenue ruling ... is an interpretive regulation which is 'not entitled to the deference accorded a statute' "), but it fails to directly consider this issue. I find it necessary to do so.

In the administrative law realm, there are two types of administrative rules: legislative rules and interpretive rules. Legislative rules must be promulgated pursuant to the notice and comment provisions of the Administrative Procedure Act (APA). These rules have the full force of law because they are the result of a statutory delegation of authority to the agency by Congress. *Chevron* involved a legislative rule.

Interpretive rules, on the other hand, are rules that explain or interpret a statute or regulation, and they do not carry the force of law. For this reason, they are excepted from the procedural requirements of the APA. *See* 5 U.S.C. § 553(b)(A). They therefore lack the procedural safeguards of the notice-and-comment period. It would be contrary

---

**1.** *Chevron U.S.A. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

**2.** Note that I do not say that we must *defer to* the IRS's regulation, for it is not at all clear that *Chevron* deference applies to this regulation. As discussed more fully *infra*, there is a distinction between the legislative rules and the interpretive rules of an agency. The general rule is that legislative rules are entitled to great deference, while interpretive rules are not. Treasury regulations as a class are generally interpretive, not legislative, and thus are not entitled to as much deference. *See Rowan Cos. v. United States,* 452 U.S. 247, 253, 101 S.Ct. 2288, 2292, 68 L.Ed.2d 814 (1981) (Treasury regulation promulgated under Commissioner's general authority to "prescribe all needful rules and regulations," I.R.C. § 7805(a), is owed "less deference than a regulation issued under a specific grant of authority to define a statutory term or to prescribe a method of executing a statutory provision"); *Brown v. United States,* 890 F.2d 1329 (5th Cir.1989) ("[A]n 'interpretive regulation' is entitled to somewhat less judicial deference than a 'legislative regulation.' "). Section 31.3121(b)(13)–1 was, like those at issue in *Rowan Cos.* and *Brown,* adopted pursuant to the general authority of the Treasury Department under I.R.C. § 7805(a) and not under a specific grant of authority to explain the student nurse exception. As such, it is entitled to less deference that a legislative rule such as the one at issue in *Chevron.*

In the wake of *Chevron,* the Supreme Court and commentators alike have debated the extent of the *Chevron* holding. One of the areas left uncertain is precisely this one—whether *Chevron* deference applies to interpretive as well as legislative rulings. This issue need not be resolved here, however, because we are concerned with a revenue ruling and not a regulation.

to the intent of the APA (and thus of Congress) to permit an agency to do by interpretive rule what Congress intended it to do by legislative rulemaking.[3] For the court then to defer to the "agency's answer" where that answer is an interpretive rule would be not only contrary to congressional intent but also a neglect of judicial duty in reviewing agency determinations under 5 U.S.C. § 702.

This revenue ruling falls within the category of an interpretive rule. *See Redhouse v. Commissioner*, 728 F.2d 1249, 1253 (9th Cir.), *cert. denied*, 469 U.S. 1034, 105 S.Ct. 506, 83 L.Ed.2d 397 (1984); *Wing v. Commissioner*, 81 T.C. 17, 27, 1983 WL 14849 (1983) ("revenue rulings . . . have been held to be the classic example of an interpretive ruling and exempt from the notice-and-comment provisions of the APA section 553"). In fact, when faced with a challenge to the legality of one of its revenue rulings (on grounds that the ruling was not subject to a notice-and-comment period), the IRS usually defends by arguing that the revenue ruling is an interpretive rule and hence exempt from the notice and comment requirements. *See Gibson Wine Co. v. Snyder*, 194 F.2d 329 (D.C.Cir.1952); *Eastern Ky. Welfare Rights Org. v. Simon*, 506 F.2d 1278 (D.C.Cir.1974), *vacated on other grounds*, 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976).

Some have argued for an expansive reading of the *Chevron* decision that would apply broadly enough to require deference to almost any agency interpretation, including this revenue ruling. However, the majority does not seem to go this far, and the post-*Chevron* case law and most commentators do not believe this extension to be warranted. *See generally* Robert A. Anthony, *Which Agency Interpretations Should Get Judicial Deference?—A Preliminary Inquiry*, 40 Admin.L.Rev. 121, 121–29 (1988). This position also seems to be bolstered by one of the Court's more recent decisions involving an interpretive ruling by the IRS, *Davis v. United States*, 495 U.S. 472, 110 S.Ct. 2014, 109 L.Ed.2d 457 (1990). Although the Court in *Davis* accepted the IRS's interpretation of a statute, it did not cite *Chevron* once in its opinion. For the Court to, in reviewing an agency's interpretation of a statute, *not* cite its most important administrative law opinion in decades, suggests that *Chevron* deference is not so broad as to encompass an interpretive ruling by the IRS. Therefore, I would hold that *Chevron* deference should not be applied to this revenue ruling as it would be applied to a "legislative" regulation.

If *Chevron* deference should not be applied to what I would call "second-tier" agency interpretations (regulations being the first tier and further interpretive explanations by the agency, the second tier), what sort of deference, if any, should be accorded to a revenue ruling? The answer is suggested by *Skidmore v. Swift & Co.*, 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944). After discussing the fact that the Administrator of the Fair Labor Standards Act, while not vested

---

**3.** Professor Robert Anthony makes this point well:

> Interpretive rules have a high degree of formality, and usually carry the authority of being issued at the agency-head level. By definition, however, they do not have the force of law. They are not intended to bind the agency, and it would therefore be unfair for them to bind private parties. But that would be the result if *Chevron* deference were accorded to interpretive rules, since the courts would have to accept them unless they were unreasonable, very much as they must do with legislative rules. In terms of their practical binding effect, then, interpretive rules would become virtually indistinguishable from legislative rules.
>
> . . . [A]s a practical matter, the agency would be able to bind the court and the public with a rule that did not bind the agency itself and that was exempt from the public processes of notice and opportunity for comment.

Robert A. Anthony, *Which Agency Interpretations Should Get Judicial Deference?—A Preliminary Inquiry*, 40 Admin.L.Rev. 121, 134 (1988) (footnotes omitted).

> A student Note has made a similar observation:
> If courts allow agencies to accomplish legislative ends through interpretive rules, courts allow agencies to circumvent the procedures set down by Congress. Agencies will most certainly take advantage of this "loophole." This is not to suggest that agencies are power-grabbers, but rather that it would simply be easier for agencies to create rules without public "interference."

Note, *The Revival of* Skidmore v. Swift: *Judicial Deference to Agency Interpretations after* EEOC v. Aramco, 42 Duke L.J. 166, 200 (1992) (citing Robert A. Anthony, *Interpretive Rules, Policy Statements, Guidances, Manuals, and the Like—Should Federal Agencies Use Them to Bind the Public?*, 41 Duke L.J. 1311, 1317 (1992)).

with legal authority to promulgate regulations on the particular topic at bar, had a particular expertise in deciding issues arising under the Act, the Court wrote,

> We consider that the rulings, interpretations and opinions of the Administrator under this Act, while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance. The weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.

*Id.* at 140, 65 S.Ct. at 164.[4] One commentator has described this "*Skidmore* consideration" thus:

> ... Under this approach, the agency interpretation is a substantial input and counts for something, much as legislative history may count. But the authoritative act of interpretation remains with the court. The court considers the agency view, and approves it only if it is deemed correct.
>
> Under *Skidmore*, the weight given the agency interpretation, and the ultimate determination to adopt it as correct or to overturn it, usually depend on a variety of circumstances or "factors," such as the importance of agency expertise, contemporaneity of the interpretation with enactment of the statute, longstanding application and consistency of the agency interpretation, the possibility of congressional acquiescence, and numerous others. These factors are often the same as those which, in other contexts, could help the

court determine whether Congress delegated interpretive authority to the agency, or whether the agency interpretation was a reasonable one.

Robert A. Anthony, *Which Agency Interpretations Should Bind Citizens and the Courts?*, 7 Yale J. on Reg. 1, 13–14 (1990) (footnotes omitted) [hereinafter Anthony, *Which Agency?* ].

The consideration of factors such as those cited above is extremely important in a case such as this where the "agency's answer" is a direct interpretation of a statute. In fact, the Supreme Court itself has engaged in a serious debate as to whether *Chevron* deference applies at all to a "pure question of statutory construction." This issue was first raised by Justice Stevens (the author of *Chevron* ) in his opinion in *INS v. Cardoza–Fonseca*, 480 U.S. 421, 446, 107 S.Ct. 1207, 1221, 94 L.Ed.2d 434 (1987), where he, with the concurrence of four Justices, offered his belief that pure questions of statutory interpretation were for the court to decide. Justice Scalia filed a concurring opinion in which he expressed his strong disapproval of Justice Stevens's opinion, arguing that it undermined *Chevron*. *Cardoza–Fonseca*, 480 U.S. at 452, 104 S.Ct. at 1223–24 (Scalia, J., concurring). Following this decision, the point has been revisited several times, with the Justices divided on the issue. *See, e.g., NLRB v. United Food & Commercial Workers Union*, 484 U.S. 112, 123, 108 S.Ct. 413, 416, 98 L.Ed.2d 429 (1987) (Brennan, J.) (focusing on the *Cardoza–Fonseca* approach and only mentioning *Chevron* ); *id.* at 133–34, 108 S.Ct. at 416 (Scalia, J., concurring, joined by three other Justices) (emphasizing that the decision of the Court is consistent with *Chevron* and rejecting the "dicta" of *Cardoza–Fonseca* ). *See generally* Anthony,

---

**4.** Lest it be thought that *Skidmore* is a forty-nine-year-old case without vitality today, consider both the pre-*Chevron* and the post-*Chevron* cases relying on it. Many pre-*Chevron* cases cited it or adopted its principles. *See, e.g.,* Batterton v. Francis, 432 U.S. 416, 425 n. 9, 97 S.Ct. 2399, 2405 n. 9, 53 L.Ed.2d 448 (1977) ("[A] court is not required to give effect to an interpretive regulation. Varying degrees of deference are accorded to administrative interpretations, based on such factors as the timing and consistency of the agency's position, and the nature of its exper-

tise."); *Joseph v. United States Civil Serv. Comm'n*, 554 F.2d 1140, 1154 n. 26 (D.C.Cir. 1977) ("Legislative rules have the full force of law and are binding on a court subject only to review under an arbitrary and capricious standard. Interpretive rules do not have the force of law and even though courts often defer to an agency's interpretive rule they are always free to choose otherwise."). In the post-*Chevron* era, the Court itself has cited *Skidmore* at least seven times. *See* Note, *supra* note 3, at 188 n. 116 (compiling cases).

*Which Agency?, supra,* at 9–12, 20–23; Maureen B. Callahan, *Must Federal Courts Defer to Agency Interpretations of Statutes?: A New Doctrinal Basis for* Chevron U.S.A. v. Natural Resources Defense Council, 1991 Wis.L.Rev. 1275, 1294–98; Antonin Scalia, *Judicial Deference to Administrative Interpretations of Law,* 1989 Duke L.J. 511.

As further support for the proposition that a revenue ruling is not entitled to *Chevron* deference, I note that Professor Bonfield, in his drafting of the Model State Administrative Procedure Act (MSAPA), included a provision similar to the federal APA's provision exempting interpretive rules from the notice and comment requirements, but specifically provided for *de novo* judicial review of any such interpretative rules issued. Professor Bonfield writes:

> The MSAPA differs from most existing state APA's by broadly exempting from required rulemaking procedures all 'interpretative rules'—rules that only define 'the meaning of a statute or other provision of law or precedent if the agency does not possess delegated authority to bind the courts to any extent with its definition.' To eliminate some of the dangers of that exemption, however, the Act requires a court reviewing the lawfulness of such rules adopted without usual procedures to review their propriety wholly anew, without any deference whatsoever to the agency interpretation.

Arthur E. Bonfield, *The Quest for an Ideal State Administrative Rulemaking Procedure,* 18 Fla.St.U.L.Rev. 617, 634 (1991) (footnotes omitted).

The bottom line on all of this is fairly summed up by Professor Anthony:

> Though an agency intends to impose the interpretation bindingly rather than tentatively, and may do so without undergoing notice-and-comment procedures, it might not succeed in fulfilling that intention. If

the interpretation is not issued legislatively, it is not binding upon courts under the doctrine of *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, [104 S.Ct. 2778, 81 L.Ed.2d 694] (1984); the reviewing court must give the agency interpretation respectful attention, but may arrive independently at its own interpretation, even if that of the agency is reasonable.

Robert A. Anthony, *Interpretive Rules, Policy Statements, Guidances, Manuals, and the Like—Should Federal Agencies Use Them to Bind the Public?,* 41 Duke L.J. 1311, 1376 (1992).

Proceeding then to consider Revenue Ruling 85–74, I would find that the ruling does not comport with the fair meaning of the statute or with its supposed legislative history. It is beyond dispute that Revenue Ruling 85–74 is a restrictive, almost emasculating, reading of the statute. In fact, the majority itself cites with apparent agreement the allegation that the third condition of the ruling, by itself, "nullifies" § 3121(b)(13). Yet, the majority finds solace in the fact that the ruling attempts to match the legislative history of the exemption. This approach makes legislative history the law, and relegates statutory language to the category of the unnecessary and superfluous. The societal changes that have expanded the class of those who, on a plain reading of the statute, are eligible for the student nurse exemption do not demand that the IRS nullify the congressionally enacted statute. Just because a statute outlives the actual intent of Congress does not mean that a court, or an agency, may overrule it. Anachronistic statutes are not unconstitutional, illegal, or even contrary to the principles of democracy. In fact, they are the embodiment of the legislative power to enact a law and leave it in place until the legislature sees fit to repeal it.[5]

---

**5.** Justice Scalia has made this point more eloquently:

> The principle of our democratic system is not that each legislature enacts a purpose, independent of the language in a statute, which the courts must then perpetuate, assuring that it is fully achieved but never overshot by expanding or ignoring the statutory language as changing

circumstances require. To the contrary, it seems to me the prerogative of each currently elected Congress to allow those laws which change has rendered nugatory to die an unobserved death if it no longer thinks their purposes worthwhile; and to allow those laws whose effects have been expanded by change to remain alive if it favors the new effects.

In light of *Skidmore*, it is clear why we should not defer to the IRS's interpretation in this case, for Revenue Ruling 85–74 satisfies few, if any, of the *Skidmore* factors: the IRS has no particular expertise in using legislative history to interpret a statute, the ruling was issued long after both the statute and the IRS's own regulation, there is little history or consistency in the application of the ruling, and the ruling was simply an attempt to figure out what the 1939 Congress would have wanted done with regard to the income of student nurses in the 1980s. The majority asserts that it has not been shown that the ruling is contrary to the legislative history, but it bears noting that there is no legislative history on the precise subsection at issue; the language upon which the IRS relied and upon which the majority relies is nothing more than a general statement made in the House of Representatives' report on the bill's inclusion of numerous exemptions from FICA. Neither the IRS nor the majority cites to any commentary on the student nurse exemption. If this legislative history is relevant at all, it hardly compels the restrictive reading of the statute given by the IRS.

For these reasons, I would hold that Revenue Ruling 85–74 is inconsistent with both the statute and the regulation and decline to accept it. The interpretation I would adopt is one that fairly reflects the meaning of the statute and one which does not do violence to the legislative history. I would allow the exemption from FICA withholding for any student nurse who satisfied the following criteria:

(a) The student nurse is enrolled and is regularly attending classes in a nurse's training school chartered or approved pursuant to state law;

(b) The student nurse is actively pursuing a nursing degree;

(c) The student nurse is employed by a hospital;

(d) The student nurse's job duties are related to the practice of nursing;

(e) The employment is substantially less than full time.

Each of these factors can be justified based on the plain language of the statute or the unequivocal intent of Congress. Elements (a) and (c) come directly from the language of the statute. Element (b) follows directly from element (a) and simply seeks to exclude those who might be enrolled in a class or two for a purpose other than the pursuit of a degree, e.g., keeping current on medical developments, brushing-up on forgotten skills or knowledge, or intermittently taking classes that will eventually satisfy the requirements of an advanced degree. Element (d) is a common sense requirement flowing from the language of the statute, "employment *as a* student nurse"; the employment of a student nurse in *any* capacity does not satisfy the requirements, it must be employment *as a* student nurse. Element (e) is derived from the general statement in the legislative history that Congress was not intending to exempt wages from a full-time job, but simply earnings from part-time work, which, in the aggregate, could be described as "nominal." Absent from my interpretation is the academic credit requirement that, in my view, finds no support in the legislative history or the historical background.[6]

Briefly, then, I would hold that the student nurses before us do qualify for the exemption. The IRS concedes that the student nurses meet elements (a), (b), and (c). The student nurses satisfy element (d) also, because their job duties relate to the eventual practice of general nursing, specialized nursing, or nursing administration. The job category that is perhaps borderline is the ACC secretary, but because that job involves tasks related to nursing administration, it satisfies element (d). The fact that the ACC secretary need only have a high school degree to qualify for the position is not controlling on the issue of whether a student nurse employed in that position has "employment *as a* student nurse," the intent of element (d). Finally, element (e) is satisfied because all of

---

*Kmart Corp. v. Cartier, Inc.*, 486 U.S. 281, 325, 108 S.Ct. 1811, 1834, 100 L.Ed.2d 313 (1988) (Scalia, J., dissenting in part).

**6.** *See infra* part B (discussing the academic credit requirement).

the student nurses were part-time employees and their wages nominal.[7]

## B. The Majority's Chevron Analysis is Flawed

Even if I were to believe that *Chevron* deference was appropriate in this case, I would find it necessary to write separately to express my disagreement with the majority's view of how the *Chevron* analysis is to be conducted.

A careful study of the majority opinion reveals the following. First, the majority recites the statutory language and the revenue ruling, describing the revenue ruling as "explaining the student nurse exception and the applicable legislative history." Next, it quotes the familiar *Chevron* two-step test. Then the majority says: "A brief historical overview of the origination of the exemption is necessary in order to [determine whether Congress's intent is clear and unambiguous]." With that, the majority goes first to the legislative history of the statute, and then briefly to some historical facts about nursing education, to see if any ambiguity or lack of clarity can be found. The majority never considers whether the language of the statute admits of ambiguity. This is in direct contravention of the dictates of *Chevron*, which requires that we "employ[ ] traditional tools of statutory construction" in order to determine the intent of Congress. 467 U.S. at 843 n. 9, 104 S.Ct. at 2782 n. 9. The first and most important of such tools is the plain language of the statute. If the statute explains itself sufficiently, our inquiry is at an end.

The reasons for *not* going to the legislative history first are perfectly illustrated by the majority's opinion. The majority writes,

> The exception appears to be available to any student nurse who is enrolled and attending classes in an approved nurses' training school, regardless of whether the student received academic credit for his employment. This interpretation, however, gives rise to an inherent ambiguity within the statute. According to the historical context in which this provision was passed, the exception was intended for students whose employment would be credited toward their degree, as was required in 1939.

Under the majority's reasoning, a statute that says *A*, in the face of legislative history that purportedly says *B*, can be said to be "inherently ambiguous." If this reasoning is correct, step two of *Chevron* would be reached in almost every instance because of the nature of legislative history. When excavating the legislative history, one is *bound* to find conflicting opinions and evidence that at least arguably create "ambiguity" or imprecision in the statute.[8] Implicit in *Chevron* is the assumption that courts will avoid the legislative history when considering a statute's clarity. Congress has created plenty of statutes that are facially ambiguous; the judicial branch should stay out of that business by refusing to create ambiguities in facially unambiguous statutes by resort to comments, debates, or even historical background unearthed in the legislative history. I do not say that legislative history is never relevant or useful as one of the "tools of statutory construction"; but I strongly disagree with the majority's view that it is the first tool to

---

7. I admit that my conclusion that the wages were nominal is an arguable one. The district court found that the highest amount that any of the student nurses earned was $4,852 in a seven month period. This figure was strongly contested on appeal, but I cannot say that the district court's finding was clearly erroneous. Remaining, however, is the conclusion of law as to whether $4,852 is "nominal," and I concede that this figure is the close to the outer limit of "nominal."

The majority's view on this matter is unclear. Although it discusses the hospital's argument that the wages were in fact nominal, it holds that "the district court did not err in its calculation of

wages," without discussing whether it views those wages as nominal or not.

8. Justice Scalia has written that "determining the subjective intent of legislators is a perilous enterprise." *Edwards v. Aguillard,* 482 U.S. 578, 638, 107 S.Ct. 2573, 2606, 96 L.Ed.2d 510 (1987) (Scalia, J., dissenting). And even proponents of the use of legislative history admit that rather than a unified congressional intent, the "legislative history is more apt to be a cacophony of many voices and many themes." *See* Patricia M. Wald, *Some Observations on the Use of Legislative History in the 1981 Supreme Court Term,* 38 Iowa L.Rev. 195, 206 (1982).

be employed in determining congressional intent.

Finally, if we do eventually reach step two of *Chevron,* we do not simply turn our papers over and put our heads down on our desks. Instead, we carefully consider the "agency's answer" to see if it is a permissible reading of the statute. The majority seems more concerned with rubber-stamping the IRS's view than with analyzing it. The majority finds that the same legislative history that gives rise to the ambiguity in the statute on the issue of whether the exemption applies only to students who are receiving academic credit for their services resolves that ambiguity. But, neither the legislative history nor the historical source cited by the majority mentions anything about the alleged ambiguity; the only reference at all to academic credit comes from the IRS's "explanation" of the legislative history as part of its Revenue Ruling 85–74. In fact, the general statement in the House report (which the majority quotes) focuses on the inconsequential amounts of tax at issue, not on the status of the taxpayer. In short, the legislative history is far from supportive of the IRS's restrictive reading of § 3121(b)(13). I therefore vigorously disagree with the *Chevron* analysis as the majority conducts it.

For the foregoing reasons, I respectfully dissent.