**FIRST CHICAGO NBD CORPORATION, Petitioner–Appellant,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.**

No. 96–4006.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 9, 1997.

Decided Jan. 28, 1998.

---

9. 69 pages × $0.75 = $51.75

10. $73.80 ÷ 36 pages = $2.05

11. 36 pages × $0.75 = $27.00

12. $168.10 ÷ 82 pages = $2.05

13. 82 pages × $0.75 = $61.50

14. 7.0 hours × $26.00 = $182.00

15. $3.00 per page × 283 pages = $849.00

Michael M. Conway (argued), Marilyn D. Franson, Hopkins & Sutter, Chicago, IL, for Petitioner–Appellant.

David E. Carmack, Thomas J. Clark, Edward T. Perelmuter (argued), Department of Justice, Tax Division, Appellate Section, Washington, DC, for Respondent–Appellee.

Before POSNER, Chief Judge, and BAUER and COFFEY, Circuit Judges.

POSNER, Chief Judge.

■ Section 901 of the Internal Revenue Code allows taxpayers to take a credit against their federal income taxes for taxes paid to a foreign government. What if the taxpayer owns just a piece of a foreign corporation? Section 902(a), as it read until 1986, provided that "a domestic corporation which owns at least 10 percent of the voting stock of a foreign corporation from which it receives dividends" shall (for purposes of the foreign tax credit) be deemed to have paid to the foreign government the fraction of foreign taxes on the profits of the foreign corporation that is equal to the ratio of the dividends received by the domestic corporation to the total profits of the foreign corporation. So if, for example, the domestic corporation owns 10 percent of the voting stock of the foreign corporation, and the dividends it receives from the foreign corporation are 6 percent of the foreign corporation's profits, the domestic corporation is entitled to a credit of 6 percent of the foreign taxes paid by the foreign corporation on those profits. The novel question that we are asked to decide is whether a group of affiliated domestic corporations that file a consolidated income tax return can aggregate the affiliates' stockholdings in a foreign corporation to reach the 10 percent threshold. Section 902 was amended in 1986, but the amendments do not affect either the tax years involved in this case or the issue of aggregation.

Five corporations, wholly owned subsidiaries of First Chicago NBD Corporation, a bank holding company (we'll call both it and the affiliated group "First Chicago"), together owned, during the tax years in issue, more than 10 percent of the voting stock of a Dutch bank (N.V. Slavenburg's Bank). As none of the affiliates owned 10 percent by itself, the issue of aggregation is critical to First Chicago's right to take, on the consolidated return that it files with its subsidiaries, a tax credit for the Dutch taxes allocable to the dividends that the subsidiaries received from the Dutch bank. The Internal Revenue Service refused to aggregate, formalizing its position in Rev. Rul. 85–3, 1985–1 C.B. 222, and issuing a notice of deficiency to First Chicago which First Chicago challenged in the Tax Court. That court upheld the *Service, First Chicago Corp. v. Commissioner,* 96 T.C. 421, 1991 WL 29006 (1991), and First Chicago, after further proceedings unnecessary to discuss, appealed to us.

■ The statute, read literally, does not permit aggregation. It refers to "a" corporation, not a group of affiliated corporations. The IRS has decided to read the statute literally, and a threshold issue is how much deference to give its reading. The answer is

that it is entitled to respectful consideration, *Foil v. Commissioner*, 920 F.2d 1196, 1201 (5th Cir.1990); see also *Davis v. United States*, 495 U.S. 472, 484, 110 S.Ct. 2014, 2021–22, 109 L.Ed.2d 457 (1990); *New York v. EPA*, 133 F.3d 987 (7th Cir.1998); *United States v. Wisconsin Power & Light Co.*, 38 F.3d 329, 334–35 (7th Cir.1994); *Indiana National Corp. v. United States*, 980 F.2d 1098, 1102–03 (7th Cir.1992); *ABC Rentals of San Antonio, Inc. v. Commissioner*, 97 F.3d 392, 396–97 (10th Cir.1996); *Wood v. Commissioner*, 955 F.2d 908, 913 (4th Cir.1992); John F. Coverdale, "Court Review of Tax Regulations and Revenue Rulings in the *Chevron* Era," 64 *Geo. Wash. L.Rev.* 35, 82–83 (1995); Linda Galler, "Judicial Deference to Revenue Rulings: Reconciling Divergent Standards," 56 *Ohio St. L.J.* 1037, 1068–73 (1995), but not to the deference that the *Chevron* doctrine (see *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *Hanson v. Espy*, 8 F.3d 469, 474–77 (7th Cir.1993); *Bell Atlantic Tel. Cos. v. FCC*, 131 F.3d 1044, 1047–50 (D.C.Cir.1997); *Gunn v. U.S. Dept. of Agriculture*, 118 F.3d 1233, 1238 (8th Cir.1997)) requires in its domain. Coverdale, *supra*, 64 *Geo. Wash. L.Rev.* at 84–88; Galler, *supra*, 56 *Ohio St. L.J.* at 1068–73; cf. *Commissioner v. Schleier*, 515 U.S. 323, 336 n. 8, 115 S.Ct. 2159, 2167 n. 8, 132 L.Ed.2d 294 (1995). That domain consists of statutory gaps (fissures, puzzles, anomalies, etc.) that Congress has left for the agency administering the statute in question to fill; the court is not to second-guess the agency's gap-filling unless the agency is being unreasonable.

There are plenty of gaps in the Internal Revenue Code. But the authorized mode of gap-filling is by Treasury Regulations, which are issued after notice and an opportunity for public comment, see Galler, *supra*, 56 *Ohio St. L.J.* at 1042–44; 5 U.S.C. § 553(b), (c); *Hoctor v. U.S. Dept. of Agriculture*, 82 F.3d 165, 167 (7th Cir.1996), rather than by Revenue Rulings. This court, sitting en banc, has held that interpretive rules, which are not subject to the requirements of notice and comment rulemaking, 5 U.S.C. § 553(b)(A); *Hoctor v. U.S. Dept. of Agriculture, supra*, 82 F.3d at 169–70, are not entitled to *Chev-*

*ron* deference. *Atchison, Topeka & Santa Fe Ry. v. Peña*, 44 F.3d 437, 442 (7th Cir. 1994) (en banc), aff'd, without discussion of the point, under the name *Brotherhood of Locomotive Engineers v. Atchison, Topeka & Santa Fe R.R.*, 516 U.S. 152, 116 S.Ct. 595, 133 L.Ed.2d 535 (1996). (Earlier suggestions to the contrary by panels of this court therefore can no longer be considered authoritative. *Kohler Co. v. Moen Inc.*, 12 F.3d 632, 634 n. 3 (7th Cir.1993); *Bethlehem Steel Corp. v. Bush*, 918 F.2d 1323, 1327–28 and n. 3 (7th Cir.1990).) The issue is open elsewhere, see *Health Ins. Ass'n v. Shalala*, 23 F.3d 412, 424 n. 8 (D.C.Cir.1994), and we consider its application to interpretive rules issued by the Treasury to be open even in this circuit, since the Treasury has decided to use the notice and comment procedure for interpretive rules, Galler, *supra*, 56 *Ohio St. L.J.* at 1044, though not required to do so by statute. But for present purposes what is important is that the Treasury's decision represents a judgment about the procedures appropriate for interpretations of the Internal Revenue Code that invite maximum deference by reviewing courts. Revenue Rulings are not subjected to these procedures, and they are therefore entitled to less weight.

But not to no weight. The Internal Revenue Service knows more about the tax laws than the judges of the federal appellate courts do, and so it is natural for us to give some weight to its views about the meaning and application of those laws. *Id.* at 1077–82. And that is what we shall do. The fact that the IRS first decided to give section 902(a) the reading embodied in Rev. Rul. 85–3 in this very case is not to be held *too* strongly against the Service, although there is a definite flavor of its seeking opportunistically to bolster a litigating position. The aggregation issue apparently had not arisen before, even informally, so there would have been no occasion to issue a Revenue Ruling earlier. It would be anomalous to give weight to the Service's interpretation only in cases against taxpayers who come *after* the one who first decided to sail close to the wind. A treatise on international taxation, moreover, agrees (and no authority that we

have found disagrees) with the IRS's reading of section 902. 2 Joseph Isenbergh, *International Taxation* ¶ 35.4, p. 35:5 (2d ed.1997). It is also a reading consistent with the general principle that corporations are treated as separate taxable entities even if they are 100 percent affiliates, as here, although the right of affiliated corporations to file a consolidated return is an exception to this general principle and one whose bearing on this case we shall have to consider. The IRS's reading has the further virtue of simplifying the administration of the tax laws by avoiding inquiry into issues of indirect or de facto ownership, at least when the indirect or de facto owner is another corporation; the importance of this qualification will become clear shortly.

First Chicago argues that the word "owns" in section 902 could mean "owns directly or indirectly." It points out that the IRS has deleted the provision of a proposed regulation under section 902 that would have glossed "owns" in section 902 to mean "owns directly." 62 Fed.Reg. 923, 924 (Jan. 7, 1997). At worst, the deletion shows only that the IRS has been having trouble making up its mind, which would not do much for First Chicago's interpretation. But in fact the reason for deleting "directly" was only, so far as we can discover, that the IRS allows indirect ownership by means of a partnership or a grantor trust, or a corporation in a "cross-sale" situation governed by section 304 of the Code; and these situations are distinguishable from that of First Chicago. If one of the corporations making up the First Chicago family owned 5 percent of the Dutch bank's voting stock directly and 5 percent through a partnership, the holdings would be aggregated for purposes of section 902. But that would be because a partnership is not a separate taxable entity. 26 U.S.C. § 701. Nor is a grantor trust, 26 U.S.C. § 671. But a corporation is. Cross-sales may have been given special treatment because of the specific legislative history of section 304, see Rev. Rul. 91–5, 1991–1 C.B. 114; Rev. Rul. 92–86, 1992–2 C.B. 199—but the partnership and grantor-trust exceptions alone would have required the IRS to drop "directly" from the new regulation.

First Chicago points out correctly that, so far as anyone can tell from the history of section 902, the 10 percent threshold is arbitrary, having been adopted for administrative convenience merely. Congress was worried that some American corporations might have small portfolio-type investments in foreign corporations, and it did not want to burden the IRS with having to compute tiny fractions of foreign taxes allocable to the dividends that these investments generated for the American corporation. See S.Rep. No. 781, 82d Cong., 1st Sess. 54–55 (1951); 2 Isenbergh, *supra*, ¶ 35.4, p. 35:5; 1 Elisabeth A. Owens & Gerald T. Ball, *The Indirect Credit: A Study of Various Foreign Tax Credits Granted to Domestic Shareholders Under U.S. Income Tax Law* 45 and n. 21 (1975). The inconvenience of adding up the fractional ownership of affiliated corporations filing a single tax return would be less, as First Chicago argues. But it is clear that Congress was wielding the bluntest of instruments in setting a threshold for the foreign tax credits of part owners, rather than seeking a delicate adjustment of administrative burden to corporate taxpayers' interests in avoiding double taxation. An American corporation that owned 1 percent of a foreign corporation that distributed $100 million in annual dividends would not be entitled to any foreign tax credit, whereas if it owned 10 percent of a foreign corporation that distributed $100,000 in annual dividends it would be. With such arbitrariness built into the statute, it is difficult to attribute to Congress a desire to avoid the element of arbitrariness that First Chicago has stubbed its toes on; and arbitrariness is everywhere in the tax code, so that an approach to interpretation that sought to purge the arbitrary from the code would be quixotic.

This is not to say that the IRS's interpretation can be referred to legislative intent; probably Congress had no intent with regard to the question of aggregation, a question that, so far as appears, did not occur to anyone in Congress. But the fact that we cannot know how Congress would have treated the question that has arisen in this case had it foreseen it cannot help First Chicago; it can only lend weight to the interpretation

by the agency charged with administering the federal tax laws.

First Chicago also argues, however, that the regulation governing the computation of foreign tax credits when a consolidated return is filed, Treas. Reg. § 1.1502–4(c), entitles it to aggregate the holdings of its affiliates in the Dutch bank. The regulation provides that the credit "shall be determined on a consolidated basis under the principles of sections 901 through 905," thus including section 902, and that "taxes paid or accrued ... (including those deemed paid or accrued) to all foreign countries ... by members of the group shall be aggregated." Read most naturally, this means only that the return consolidates the foreign tax credits determined in accordance with section 902, which denies credits if the corporation has less than 10 percent of the voting stock. If two affiliated corporations filing a consolidated return each own 10 percent of the voting stock of a different foreign corporation, then the foreign tax credit is computed as if the two affiliates were one corporation owning 10 percent of the voting stock of each of two foreign corporations. But if one (or both) of the affiliates owns less than 10 percent, it cannot be "deemed" to have paid (or accrued) a foreign tax, because section 902 forbids a domestic corporation that has less than 10 percent of the voting stock of a foreign corporation to deem a portion of that corporation's taxes paid by the domestic corporation. And so there is nothing to consolidate.

This interpretation of the regulation is not inevitable. It would be wrong, or the regulation invalid, if section 902 embodied First Chicago's conception of indirect ownership— but it doesn't. It is the more natural interpretation, and it is not undermined by First Chicago's efforts to generate ambiguity by reference to still other regulations—an esoteric slugfest, unnecessary to recount, in which the IRS lands as many blows as its opponent.

First Chicago argues that the IRS's interpretation produces an anomaly. If none of the affiliates owns 10 percent or more of the voting stock of the Dutch bank, then, under the IRS's interpretation, none can take a tax credit; but all obtain *in effect* a deduction of the foreign taxes they pay, because the dividends which they receive from the bank and on which they are taxed are net of any taxes the bank may have paid. If, however, one of the affiliates owned 10 percent or more of the voting stock of the Dutch bank, and another affiliate owned less than 10 percent of the voting stock of the same bank, the first affiliate would get a tax credit while the second would get its "in effect" deduction, and this is said to be contrary to a regulation which provides that if a consolidated group takes a foreign tax credit on the foreign taxes paid by any member of the group it can't deduct any foreign taxes paid by other members. Treas. Reg. 1.1502–4(a). But the regulation is about formal deductions, not about situations in which the taxpayer has nothing to deduct because he receives only net income.

First Chicago complains about the IRS's back-up argument that should we agree with the taxpayer's position on aggregation we would have to remand the case to the Tax Court for a determination of whether First Chicago's affiliates viewed together *really* have at least 10 percent of the voting stock of the Dutch bank. The IRS interprets "voting stock," the statutory expression, to mean "voting power," that is, the power that the stock confers to vote for members of the board of directors. Rev. Rul. 84–6, 1984–1 C.B. 178. The Dutch bank's corporate charter discriminates against large shareholders, so that if the Service is correct no corporate owner of 10 percent of the stock of the Dutch bank would be entitled to a foreign tax credit. Neither the Code nor the regulations define "voting stock," but the Service's interpretation is generally accepted, 2 Isenbergh, *supra*, ¶ 35.7, p. 35:9, though it bristles with difficulties. See Owens & Ball, *supra*, at 46–48. Assuming it is sound, it is not a reason to read section 902 to permit the aggregation of affiliated corporations' stock holdings. It is as likely to help as to hurt taxpayers. It would enable a corporation to claim the foreign tax credit even if it had less than 10 percent of the voting stock of a foreign corporation, so long as it had more than 10 percent of the voting power, as it might if its shares conferred greater voting rights than

some other class of voting stock. The meaning of "voting stock" is independent of whether indirect ownership of it entitles the indirect owner to a tax credit.

AFFIRMED.