129 T.C. No. 15

UNITED STATES TAX COURT

PSB HOLDINGS, INC., Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 14724-05.                    Filed November 1, 2007.

       P is the holding company of an affiliated group of
corporations that files consolidated Federal income tax
returns.  The other members are P's wholly owned bank
(B) and B's wholly owned investment company (IC).  Both
B and IC own tax-exempt obligations.  Only B incurs
interest expenses.  IC's tax-exempt obligations were
either purchased by IC or received from B before the
subject years as contributions to capital.  R
determined that B must include all of IC's tax-exempt
obligations in the calculation of B's average adjusted
bases of tax-exempt obligations under secs.
265(b)(2)(A) and 291(e)(1)(B)(ii)(I), I.R.C.  On the
consolidated income tax returns for the subject years,
B included IC's obligations in the calculation only to
the extent that B had purchased the obligations and
transferred them to IC; in other words, B omitted from
the calculation those obligations that IC purchased.
       Held:  The calculation of B's average adjusted
bases of tax-exempt obligations does not include the
tax-exempt obligations purchased by IC.

Debra Sadow Koenig, for petitioner.

Lawrence C. Letkewicz, Christa A. Gruber, and Sharon S. Galm, for respondent.


OPINION


LARO, Judge:  This case was submitted to the Court under Rule 122 for decision without trial.[1]  Petitioner petitioned the Court to redetermine respondent's determination of deficiencies of $33,622, $38,571, $41,654, and $31,868 in the 1999, 2000, 2001, and 2002 Federal income taxes, respectively, of its affiliated group.  For those years, the group filed consolidated Federal corporate income tax returns.  The group included petitioner, petitioner's wholly owned subsidiary Peoples State Bank (Peoples), and Peoples' wholly owned investment subsidiary PSB Investments, Inc. (Investments).

We decide whether Peoples must include the tax-exempt obligations purchased and owned by Investments in the calculation of Peoples' average adjusted bases of tax-exempt obligations under sections 265(b)(2)(A) and 291(e)(1)(B)(ii)(I).  We hold that the calculation does not include those obligations.

---

[1] Rule references are to the Tax Court Rules of Practice and Procedure.  Unless otherwise noted, section references are to the applicable versions of the Internal Revenue Code.

## Background

All facts were stipulated or contained in the exhibits submitted with the stipulations. The stipulated facts and exhibits are incorporated herein by this reference. When the petition was filed, petitioner's mailing address and principal place of business were in Wausau, Wisconsin.

Petitioner is a holding company and the common parent of an affiliated group of corporations that file consolidated Federal income tax returns. Petitioner's common stock is held by approximately 1,000 shareholders. The other members of the affiliated group are petitioner's wholly owned subsidiary (Peoples) and Peoples' wholly owned subsidiary (Investments). For financial and regulatory accounting purposes, Investments and Peoples consolidate their assets, liabilities, income, and expenses.

Peoples was organized in 1962 as a State bank under Wisconsin law. Peoples' main office is located in Wausau, Wisconsin, and it has several branch offices in Wisconsin communities near Wausau. Peoples is petitioner's sole subsidiary. Peoples' sole subsidiary is Investments.

On or about April 23, 1992, Peoples organized Investments in Nevada. Investments does business exclusively in Nevada, with offices in Las Vegas, Nevada, and offsite record storage at a third-party facility in Las Vegas. Investments has no depository

or lending powers, and, as relevant here, does not qualify as either a "bank" or a "financial institution" for Federal income tax purposes. For other purposes, Investments is considered to be a financial institution subject to Federal and State supervision.

Peoples organized Investments to consolidate and improve the efficiency of managing, safekeeping, and operating the securities investment portfolio then held by Peoples and to reduce Peoples' State tax liability. Nevada has neither a corporate income tax nor a corporate franchise tax. Wisconsin has a corporate franchise tax of 7.9 percent of a corporation's net income. For purposes of the Wisconsin tax, Wisconsin considers "income" to include interest income from federally tax-exempt obligations. A wholly owned subsidiary of a Wisconsin corporation with no nexus to the State is not subject to Wisconsin's corporate franchise tax. Investments was organized without a nexus to Wisconsin so as not to be subject to Wisconsin's corporate franchise tax.

From on or about April 23, 1992, through December 1, 2002, Peoples transferred to Investments cash, tax-exempt obligations, taxable securities, and loan participations (fractional interests in loans originated by Peoples), including substantially all of Peoples' long-term investments. The cash totaled $18,460 and was transferred to Investments upon its organization in exchange for all of its common stock. The tax-exempt obligations and taxable

securities totaled $38,141,487, and the loan participations totaled $27,710,909; these three categories of assets were transferred to Investments as paid-in capital.  No security or tax-exempt obligation of any kind was transferred by Peoples to Investments during the subject years.  Of the taxable securities and tax-exempt obligations that Peoples transferred to Investments, 17 percent were federally tax-exempt municipal securities, 41 percent were federally taxable securities (issued primarily by Government agencies), and 42 percent were loan participation interests.  At the time of the transfers, no liabilities encumbered the transferred securities or obligations, and Investments did not assume any liability of Peoples.  Investments did not sell any tax-exempt obligation or taxable security before maturity, and all such obligations and securities received from Investments matured by the end of the subject years.  Investments' income for the subject years was attributable to holding federally taxable securities, federally tax-exempt obligations, and loan participations.  Investments did not own any other asset, and it did not provide services to unrelated third parties.

Investments' total assets during the subject years represented about 20 percent of the total assets of Investments and Peoples combined.  During each of those years, Peoples incurred approximately $8 million to $12 million of interest

expenses; Investments incurred no interest expense.  During 1999 and 2000, Investments owned almost $14 million in tax-exempt obligations; Peoples owned virtually none.  During 2001 and 2002, Investments owned over $17 million in tax-exempt obligations, which represented more than 80 percent of the tax-exempt obligations owned by Investments and Peoples combined.

The Internal Revenue Code provides (as further discussed below) that the amount of a financial institution's interest expense allocated to tax-exempt interest, and thus rendered nondeductible, is computed by multiplying the otherwise allowable interest expense by a fraction prescribed in the statutes.  The fraction's numerator (numerator) equals "the taxpayer's average adjusted [bases] * * * of [tax-exempt] obligations".  See secs. 265(b)(2)(A), 291(e)(1)(B)(ii)(I).  The fraction's denominator (denominator) equals the "average adjusted [bases] for all assets of the taxpayer".  See secs. 265(b)(2)(B), 291(e)(1)(B)(ii)(II).  On the consolidated returns filed by petitioner's affiliated group for the subject years, Peoples included its adjusted basis in its Investments' stock in Peoples' calculation of the denominator.  Peoples' basis in its Investments' stock equaled Investments' basis in Investments' assets.  For each subject year, Peoples included all of the tax-exempt obligations that were purchased by Peoples and that were outstanding as of the end of the year in Peoples' calculation of the numerator.  Some of

those obligations were owned by Investments during the year, having been earlier transferred by Peoples to the capital of Investments.

The notice of deficiency states as follows:

It has been determined that you transferred tax-exempt securities from your bank to investment subsidiaries. By this transfer, you managed to separate tax-exempt investments from their interest expense which resulted in a reduction of your exposure to the TEFRA interest expense disallowance rules under Internal Revenue Code sections 291 and 265(b).

It has further been determined that the investment subsidiaries do not carry on any real business operations on their own. Rather, they are merely an incorporated "Shell" whose only real purpose is to avoid taxation. In actuality, their business is conducted by or through their parent banks.

It has further been determined that the investment subsidiaries' assets and liabilities are those of their parent banks, since for all other reporting purposes, both financial and regulatory, reporting is required to be done on a consolidated basis. The assets and liabilities are considered those of their parent banks. Therefore, it is determined that for purposes of computing your income tax liabilities, you must include the assets and tax-exempt securities of the subsidiaries in your computation of unallowable interest expense under the TEFRA provisions.

The recalculation of non deductible interest expense, under Sections 291 and 265(b) of the Internal Revenue Code, based on the inclusion of the assets and tax-exempt balances of Peoples State Bank and/or PSB Investments, Inc. with that of the assets and tax-exempt balances of their respective parent banks increases your taxable incomes by: $98,890 for the year ended 12-31-1999; $113,445 for the year ended 12-31-2000; $122,513 for the year ended 12-31-2001 and; $93,731 for the year ended 12-31-2002. Refer to Exhibit A through Exhibit D for further explanation.

Respondent has since conceded the determination stated in the second paragraph quoted above. Respondent also concedes that Investments was created to reduce State taxes and is a separate business entity that is not a sham.

## Discussion

We decide the narrow issue of whether Peoples must include the tax-exempt obligations purchased and owned by Investments in the calculation of Peoples' average adjusted bases of tax-exempt obligations under sections 265(b)(2)(A) and 291(e)(1)(B)(ii)(I).[2] Petitioner argues that the relevant text in those sections provides that Peoples calculate the numerator without regard to those obligations.[3] Respondent disagrees. As respondent sees

---

[2] Petitioner invites the Court to decide that the calculation does not include any tax-exempt obligation owned by Investments. We decline to do so. The consolidated returns reported that the calculation included all outstanding tax-exempt obligations purchased by Peoples and transferred to Investments, and respondent's determination in the notice of deficiency relates to that position. Moreover, petitioner states in its opening posttrial brief that it is not requesting either an adjustment or a refund as to its reporting position. Nor does the petition request such an adjustment or refund. We consider it inappropriate to decide the issue proffered by petitioner because it does not relate to the decision that we will enter on the amount of deficiency (if any) in the affiliated group's income tax for the subject years.

[3] We set forth the applicable text of secs. 265(b) and 291(e) in the appendix. The relevant text of sec. 265(b)(2)(A), "the taxpayer's average adjusted bases (within the meaning of section 1016) of tax-exempt obligations" is similar to the relevant text of sec. 291(e)(1)(B)(ii)(I), "the taxpayer's average adjusted basis (within the meaning of section 1016) of obligations described in clause (i)"; i.e., tax-exempt

(continued...)

it, the relevant text when read in the light of the statutes'
legislative intent allows respondent for purposes of the
numerator to treat Investments' assets as owned by Peoples.  We
agree with petitioner that the relevant text does not include in
the numerator the tax-exempt obligations purchased and owned by
Investments.

Section 265(a)(2) provides that no deduction shall be
allowed for interest on indebtedness incurred or continued to
purchase or carry obligations the interest on which is wholly
exempt from Federal income tax.  For purposes of that provision,
whether a taxpayer's indebtedness was incurred or continued to
purchase or carry tax-exempt obligations generally depends on the
taxpayer's purpose in incurring the indebtedness.  See Wisconsin
Cheeseman, Inc. v. United States, 388 F.2d 420, 422 (7th Cir.
1968).  In other words, a disallowance of interest expenses under
section 265(a)(2) requires a finding of a sufficiently direct
relationship between a borrowing and a tax-exempt investment.
See id.

Congress enacted section 291(a)(3) and (e)(1)(B) in 1982.
See Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA),
Pub. L. 97-248, sec. 204(a), 96 Stat. 423.  As enacted, those

---

[3](...continued)
obligations.  For purposes of our analysis, we consider the
relevant text of each of those sections to be the same and refer
to that text as the relevant text.

provisions provided a 15-percent cutback in a corporate tax
preference item affecting certain financial institutions.[4]  The
cutback applied to the deduction otherwise allowable for "the
amount of interest on indebtedness incurred or continued to
purchase or carry [tax-exempt] obligations acquired after
December 31, 1982".  The amount of the cutback was calculated by
applying to the otherwise allowable interest expense a fraction
that is virtually the same as in the current version of the
statutes.  The report of the Senate Finance Committee, the
committee in which TEFRA section 204(a) originated, sets forth
the following rationale with respect to the cutback and similar
provisions:

> Numerous corporate tax preferences have been
> enacted over the years in order to stimulate business
> investment and advance other worthwhile purposes.  For
> several reasons, some of these tax preferences should
> be scaled back.  First, the federal budget faces large
> deficits, which will require large reductions in direct
> Federal spending.  In addressing these deficits, tax
> preferences should also be subject to careful scrutiny.
> Second, in 1981 Congress enacted the Accelerated Cost
> Recovery System, which provides very generous
> incentives for investment in plant and equipment.  ACRS
> makes some corporate tax preferences less necessary.
> Third, there is increasing concern about the equity of
> the tax system, and cutting back corporate tax
> preferences is a valid response to that concern.

---

[4] The 15-percent cutback was increased to 20 percent in the
Deficit Reduction Act of 1984, Pub. L. 98-369, sec. 68(a),
98 Stat. 588.  The referenced corporate tax preference was that
under prior law, banks had been effectively excused from sec.
265(a)(2) on the ground that their obligations to their
depositors did not constitute "indebtedness" within the meaning
of that section.

For these reasons, the committee bill contains a 15-percent across-the-board cutback in a series of corporate tax preferences. [S. Rept. 97-494 (Vol. 1), at 118-119 (1982).]

Four years later, in 1986, Congress enacted section 265(b). See Tax Reform Act of 1986, Pub. L. 99-514, sec. 902(a), 100 Stat. 2380. According to the report of the House Ways and Means Committee, Congress enacted section 265(b) for two reasons. First, the report states, financial institutions had been allowed to deduct interest payments regardless of their tax-exempt holdings, a result, the committee concluded, that discriminated in favor of financial institutions at the expense of other taxpayers. See H. Rept. 99-426, at 588-589 (1985), 1986-3 C.B. (Vol. 2) 1, 588-589. Second, the report states, financial institutions had been allowed to reduce their tax liability drastically by investing in tax-exempt obligations. Id. The report explains that

> To correct these problems, the committee bill denies financial institutions an interest deduction in direct proportion to their tax-exempt holdings. The committee believes that this proportional disallowance rule is appropriate because of the difficulty of tracing funds within a financial institution, and the near impossibility of assessing a financial institution's "purpose" in accepting particular deposits. The committee believes that the proportional disallowance rule will place financial institutions on approximately an equal footing with other taxpayers. [Id.]

The report explains that the amount of interest allocable to tax-exempt obligations for purposes of section 265(b) is

determined under rules similar to those that apply under section 291(a)(3) and (e)(1)(B).  Id.

As enacted, sections 265(b) and 291(a)(3) and (e)(1)(B) reduce the interest expense deductions of financial institutions without requiring evidence of a direct relationship between borrowing and tax-exempt investment.  Specifically, those sections disallow a deduction with respect to the portion of a financial institution's interest expense that is allocable, on a pro rata basis, to its holdings in tax-exempt obligations.  While section 265(b) disallows a deduction for the entire amount of that portion of a financial institution's interest expense allocable to tax-exempt obligations, section 291(a)(3) and (e)(1)(B) disallows only 20 percent of the interest expense allocable to those obligations.

The 20-percent rule of section 291(a)(3) and (e)(1)(B) applies with respect to tax-exempt obligations acquired from January 1, 1983, through August 7, 1986.  The 100-percent rule of section 265(b) generally applies to those tax-exempt obligations acquired after August 7, 1986.  In the latter case, however, section 265(b)(3) provides a special rule for a "qualified tax-exempt obligation", defined in section 265(b)(3)(B) as a certain tax-exempt obligation issued by small issuers.  Under section 265(b)(3)(A), a "qualified tax-exempt obligation" acquired after August 7, 1986, is treated for purposes of

sections 265(b)(2) and 291(e)(1)(B) as if it were acquired on August 7, 1986; thus, qualified tax-exempt obligations reduce interest expense deductions under section 291(a)(3) and (e)(1)(B), rather than under section 265(b). The parties agree that the tax-exempt obligations owned by Investments are "qualified tax-exempt obligations".

In calculating the amount of the denominator for Peoples, the parties agree that the denominator includes Peoples' adjusted basis in its Investments stock. The parties lock horns on whether the tax-exempt obligations purchased and owned by Investments must be included in the numerator. On the consolidated returns, Peoples omitted those obligations from the numerator. Respondent determined that those obligations are included in the numerator. As respondent sees it, because the basis of Peoples' Investments stock is included in the denominator, the portion of that basis attributable to the bases of Investments' tax-exempt obligations is included in the numerator.

We begin our analysis with the relevant text. We interpret the text with reference to the legislative history primarily to learn the purpose of the statutes and to resolve any ambiguity in the text. See <u>United States v. Am. Trucking Associations, Inc.</u>, 310 U.S. 534, 543-544 (1940). We apply the text as written unless we find that a word's meaning is "'inescapably ambiguous'"

or that such an application "'would thwart the purpose of the overall statutory scheme or lead to an absurd or futile result.'" Booth v. Commissioner, 108 T.C. 524, 568, 569 (1997) (quoting Garcia v. United States, 469 U.S. 70, 76 n.3 (1984), and Albertson's, Inc. v. Commissioner, 42 F.3d 537, 545 (9th Cir. 1994), affg. 95 T.C. 415 (1990)); see United States v. Am. Trucking Associations, Inc., supra at 543; see also United States v. Shriver, 989 F.2d 898, 901 (7th Cir. 1992); Allen v. Commissioner, 118 T.C. 1 (2002).

The applicable text refers to "the taxpayer's average adjusted [bases] * * * of [tax-exempt] obligations" and the "average adjusted bases for all assets of the taxpayer".  We read that text to refer to the tax-exempt obligations and assets owned by Peoples alone or, in other words, by the "taxpayer" for whom the subject calculation is performed.  We do not read that text to provide that a taxpayer such as Peoples must include in its tax-exempt obligations any tax-exempt obligation purchased and owned by another taxpayer, whether the taxpayers be related or not.  Cf. First Chicago NBD Corp. v. Commissioner, 135 F.3d 457 (7th Cir. 1998) (holding that section 902 did not allow aggregation where the statute referred literally to "a" corporation rather than to a group of affiliated corporations), affg. 96 T.C. 421 (1991).  We understand Congress to have enacted the text as a means for raising revenue and bolstering equity in

our tax system.  We understand Congress to have intended for the statutes to deny some or all of a financial institution's otherwise allowable interest expense deduction to the extent that the interest is allocable to the tax-exempt obligations it owns. We do not understand Congress to have specifically spoken through the statutes to the situation here, where tax-exempt obligations are purchased and owned by a subsidiary of a financial institution.

Respondent asserts that the adjusted bases of Peoples' assets in the denominator include the adjusted basis of Peoples' stock in Investments which, in turn, reflects the assets owned by Investments.  Respondent concludes that Investments' assets are therefore considered assets of Peoples for purposes of calculating the numerator.  We disagree.  The numerator consists of the "taxpayer's average adjusted bases  * * * of tax-exempt obligations", but Peoples has no adjusted bases in any of the tax-exempt obligations purchased and owned by Investments. Moreover, the statutes use the term "taxpayer" in the singular, and well-established law treats Peoples and Investments as separate taxpayers notwithstanding the fact that they join in the filing of a consolidated return.  See, e.g., Wegman's Props., Inc. v. Commissioner, 78 T.C. 786, 789 (1982) (citing, inter alia, Natl. Carbide Corp. v. Commissioner, 336 U.S. 422 (1949), Interstate Transit Lines v. Commissioner, 319 U.S. 590 (1943),

and <u>Woolford Realty Co. v. Rose</u>, 286 U.S. 319 (1932)); cf. <u>Gottesman & Co. v. Commissioner</u>, 77 T.C. 1149, 1156 (1981) ("to the extent the consolidated return regulations do not mandate different treatment, corporations filing consolidated returns are to be treated as separate entities when applying other provisions of the Code"). Nor do the consolidated return regulations, as applicable here, change this result. Those regulations require that Peoples calculate its net income separately from Investments' net income. See sec. 1.1502-11(a)(1), Income Tax Regs. (stating that taxable income is calculated for an affiliated group by taking into account the separate taxable income of each member of the group). Respondent has not identified, nor are we aware of, any provision in the consolidated return regulations that would require the tax-exempt obligations purchased and owned by Investments to be taken into account in the calculation of Peoples' interest expense deduction. Nothing that we read in the statutes or in the consolidated return regulations directs us to ignore the separate existence of Investments and Peoples or otherwise to treat Investments' self-purchased tax-exempt obligations as owned by Peoples for purposes of calculating the numerator as to Peoples.

Congress knew how to require a taxpayer to take into account the assets of another taxpayer had Congress intended to include respondent's "look-through" approach in the applicable statutes.

See, e.g., sec. 265(b)(3)(E).  Congress, however, did not in those statutes provide any aggregation or indirect ownership rule that would apply to the numerator.  Instead, Congress referred simply to the obligations of the "taxpayer" for purposes of making that calculation.  "'[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'"  Russello v. United States, 464 U.S. 16, 23 (1983) (quoting United States v. Wong Kim Bo, 472 F.2d 720, 722 (5th Cir. 1972)).

Respondent argues that not reading the relevant text as providing for Peoples' indirect ownership of the subject tax-exempt obligations leads to an "absurd" result.  We disagree.  As discussed above, Congress apparently did not specifically intend through the applicable statutes to address the gap left open in the setting at hand.  We apply the law as written by Congress and leave it to Congress or to the Department of the Treasury, the latter through and to the extent of its regulatory authority or by other permissible means, to address any gaps in the statutes as written.  See Lamie v. United States, 540 U.S. 526, 538 (2004).  To be sure, agencies such as the Internal Revenue Service have a great amount of authority to issue regulations to fill gaps in a statute.  See, e.g., Chevron

U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837,
842-844 (1984).  In addition, as applicable to taxpayers who file
consolidated returns, such as here, the Commissioner has vast
authority to prescribe regulations to curtail or otherwise
address any perceived abuse.  See United Dominion Indus., Inc. v.
United States, 532 U.S. 822, 836-837 (2001).

Respondent also argues for a contrary reading, noting that
Peoples and Investments consolidated their assets, liabilities,
income, and expenses for financial and regulatory accounting
purposes.[5]  We are unpersuaded by this argument.  Neither
financial nor regulatory accounting controls the manner in which
a taxpayer must report its operations for Federal income tax
purposes.  See Thor Power Tool Co. v. Commissioner, 439 U.S. 522,
542-543 (1979); Signet Banking Corp. v. Commissioner, 106 T.C.
117, 130-131 (1996), affd. 118 F.3d 239 (4th Cir. 1997).  In
fact, we note another major difference from the manner in which
Investments is treated for Federal income tax purposes; to wit,
that Investments is considered to be a financial institution for
Federal and State oversight purposes but is not considered to be
a bank or financial institution for Federal income tax purposes.
We also note that respondent has not argued, nor do we find, that

---

[5] While the inconsistency between financial and regulatory
accounting, on the one hand, and tax accounting, on the other
hand, appears from the notice of deficiency to be a primary
determination by respondent, respondent in brief has relegated
this inconsistency to simply a factor to consider.

he exercised any discretion afforded to him by section 446(b) or 482. Instead, as discussed above, the linchpin of respondent's arguments is that the statutes on their face require that the basis of Peoples' Investments stock be included in the denominator and that the portion of that basis attributable to the bases of Investments' tax-exempt obligations is therefore also included in the numerator.

Lastly, respondent observes, the Commissioner has issued Rev. Rul. 90-44, 1990-1 C.B. 54, interpreting the applicable statutes to provide that the tax-exempt obligations of a subsidiary may be taken into account in calculating the numerator for a parent bank. Respondent asserts that the Commissioner issued this ruling under the same formal procedures that he would have been required to follow had he prescribed regulations on the subject. Respondent argues that the revenue ruling is entitled to "judicial respect" as "persuasive precedent that should be followed unless unreasonable".

While we believe that the Commissioner's interpretation as set forth in Rev. Rul. 90-44, supra, is entitled to consideration by this Court, we decline respondent's invitation to equate the authority of the ruling with that of a regulation or otherwise to give the ruling the degree of deference that is typically afforded to regulations under Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc., supra, and its progeny. As explained below,

we evaluate the revenue ruling under the less deferential standard enunciated in Skidmore v. Swift & Co., 323 U.S. 134 (1944), according the ruling respect proportional to its "power to persuade".  See United States v. Mead Corp., 533 U.S. 218, 234-235, 237 (2001).

Rev. Rul. 90-44, 1990-1 C.B. at 57, states in relevant part:

> If one or more financial institutions are members of an affiliated group of corporations (as defined in section 1504 of the Code), then, even if the group files a consolidated return, each such institution must make a separate determination of interest expense allocable to tax-exempt interest, rather than a combined determination with the other members of the group.
>
> However, in situations involving taxpayers which are under common control and one or more of which is a financial institution, in order to fulfill the congressional purpose underlying section 265(b) of the Code, the District Director may require another determination of interest expense allocable to tax-exempt interest to clearly reflect the income of the financial institution or to prevent the evasion or avoidance of taxes.

The first quoted paragraph parallels the text of the statutes, stating that the subject calculation "must" be made separately for each member of the affiliated group.  The second quoted paragraph departs from that text, creating an exception that "may" apply to taxpayers under common control when one or more of the taxpayers is a financial institution.  The ruling sets forth no reasoning or authority for the exception, other than stating that the exception was prescribed "in order to fulfill the congressional purpose underlying section 265(b)" and may be

invoked "to clearly reflect the income of the financial institution and to prevent the evasion or avoidance of taxes".

At the outset, we note that the notice of deficiency makes no mention of Rev. Rul. 90-44, supra. Thus, while the ruling states that the District Director may require a determination of interest expense under a rule that is different from that stated in the statutes, we find no basis in the record from which to find (or to conclude) that the District Director has in fact exercised the authority purportedly given to him by the statutes. To the contrary, we read the notice of deficiency to indicate that respondent observed that Peoples had transferred tax-exempt obligations to Investments so that Peoples afterwards had interest expenses but little to no tax-exempt interest income and determined that the transfer was ineffective for Federal income tax purposes because: (1) Investments was not a legitimate business entity with independent business operations but was a sham created solely to avoid taxes, and (2) Investments' assets and liabilities are viewed as those of Peoples because Peoples and Investments reported their operations for financial and regulatory reporting purposes on a consolidated basis.

All the same, we are not bound by an interpretation in a revenue ruling. See Rauenhorst v. Commissioner, 119 T.C. 157, 173 (2002); see also Johnson v. Commissioner, 115 T.C. 210, 224 (2000). The Court of Appeals for the Seventh Circuit has held

similarly, stating that revenue rulings are entitled to limited deference.  See Bankers Life & Cas. Co. v. United States, 142 F.3d 973, 978 (7th Cir. 1998); First Chicago NBD Corp. v. Commissioner, 135 F.3d 457 (7th Cir. 1998); see also U.S. Freightways Corp. v. Commissioner, 270 F.3d 1137, 1141 (7th Cir. 2001) (discussing the level of deference owed to agency interpretations after United States v. Mead Corp., supra), revg. 113 T.C. 329 (1999).  The Commissioner also recognizes the limited strength of a revenue ruling, explaining in his procedural rules that "The conclusions expressed in Revenue Rulings will be directly responsive to and limited in scope by the pivotal facts stated in the revenue ruling", sec. 601.601(d)(2)(v)(a), Statement of Procedural Rules, and "Revenue Rulings published in the Bulletin do not have the force and effect of Treasury Department Regulations", sec. 601.601(d)(2)(v)(d), Statement of Procedural Rules.

In United States v. Mead Corp., supra, the Supreme Court considered the degree of judicial deference afforded to a ruling by the U.S. Customs Service as to a tariff classification.  The Court stated:  "We agree that a tariff classification has no claim to judicial deference under Chevron, there being no indication that Congress intended such a ruling to carry the force of law, but we hold that under Skidmore v. Swift & Co., 323 U.S. 134 (1944), the ruling is eligible to claim respect

according to its persuasiveness."  Id. at 221.  In Skidmore v. Swift & Co., supra at 140, the Court stated:

> We consider that the rulings, interpretations and opinions * * * while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance.  The weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.

See also Christensen v. Harris County, 529 U.S. 576, 587 (2000) (an agency's interpretation reached without formal notice and comment rulemaking is entitled to respect only when it has the "power to persuade"); cf. Kort v. Diversified Collection Servs., Inc., 394 F.3d 530, 539 (7th Cir. 2005).

We conclude that we must evaluate the revenue ruling at hand under the "power to persuade" standard set forth in Skidmore. While respondent invites the Court to afford the ruling greater judicial deference by asserting that the ruling was issued in the same manner as regulations on the subject would have been, we decline that invitation.  Cf. Ind. Fam. & Soc. Servs. Admin. v. Thompson, 286 F.3d 476, 480 (7th Cir. 2002).  In addition to the fact that the Commissioner's procedural rules state specifically that revenue rulings "do not have the force and effect of Treasury Department Regulations", sec. 601.601(d)(2)(v)(d), Statement of Procedural Rules, we consider most significant the fact that the revenue ruling, unlike most Treasury Department

regulations, did not undergo any public review or comment before its issuance.

In accordance with the analysis under United States v. Mead Corp., 533 U.S. 218 (2001), we decline to adopt the exception set forth in Rev. Rul. 90-44, supra.  First, as we have discussed, the exception does not properly interpret the text of the statutes as written.  See Commissioner v. Schleier, 515 U.S. 323, 336 n.8 (1995).  Second, we find in the ruling neither adequate "thoroughness evident in its consideration" nor adequate "reasoning" as to the presence of the exception in the statutes. See Skidmore v. Swift & Co., supra at 140.  The ruling simply states that the exception was included in the revenue ruling "in order to fulfill the congressional purpose underlying section 265(b)" and may be invoked "to clearly reflect the income of the financial institution and to prevent the evasion or avoidance of taxes".  Rev. Rul. 90-44, 1990-1 C.B. at 57.  Third, the revenue ruling was issued many years after the enactment of the relevant statutes, approximately 8 years after the enactment of section 291(a)(3) and (e)(1)(B) and 4 years after the enactment of section 265(b).

We hold that the numerator does not include the tax-exempt obligations purchased and owned by Investments and sustain petitioner's reporting position.  We have considered all of the

parties' arguments and have rejected those arguments not discussed herein as irrelevant or without merit.

<u>Decision will be entered under Rule 155</u>.

APPENDIX

SEC. 265(b). Pro rata Allocation of Interest Expense of Financial Institutions to Tax-Exempt Interest.--

(1) In general.--In the case of a financial institution, no deduction shall be allowed for that portion of the taxpayer's interest expense which is allocable to tax-exempt interest.

(2) Allocation.--For purposes of paragraph (1), the portion of the taxpayer's interest expense which is allocable to tax-exempt interest is an amount which bears the same ratio to such interest expense as--

(A) the taxpayer's average adjusted bases (within the meaning of section 1016) of tax-exempt obligations acquired after August 7, 1986, bears to

(B) such average adjusted bases for all assets of the taxpayer.

SEC. 291(e).  Definitions.--For purposes of this section--

(1) Financial institution preference item.--The term "financial institution preference item" includes the following:

*    *    *    *    *    *    *

(B) Interest on debt to carry tax-exempt obligations acquired after December 31, 1982, and before August 8, 1986.--

(i) In general.--In the case of a financial institution which is a bank (as defined in section 585(a)(2)), the amount of interest on

indebtedness incurred or continued to purchase or carry obligations acquired after December 31, 1982, and before August 8, 1986, the interest on which is exempt from taxes for the taxable year, to the extent that a deduction would (but for this paragraph or section 265(b)) be allowable with respect to such interest for such taxable year.

(ii) Determination of interest allocable to indebtedness on tax-exempt obligations.--Unless the taxpayer (under regulations prescribed by the Secretary) establishes otherwise, the amount determined under clause (i) shall be an amount which bears the same ratio to the aggregate amount allowable (determined without regard to this section and section 265(b)) to the taxpayer as a deduction for interest for the taxable year as--

(I) the taxpayer's average adjusted basis (within the meaning of section 1016) of obligations described in clause (i), bears to

(II) such average adjusted basis for all assets of the taxpayer.